P. J. McPHERSON, Administrator of the Estate of Gordon Chester McPherson, deceased, Libelant,

and

Ann McPherson, also known as Margie W. McPherson, Intervenor,

v.

STEAMSHIP SOUTH AFRICAN PIO-NEER, her engines, etc., in rem, and South African Marine Corporation, Ltd., in personam,

and

James S. Darling, Jr. et al., individually and trading as J. S. Darling & Son, and Severn L. Robbins et al., all being former owners and operators of the FISH-ING TRAWLER POWHATAN, in personam, Respondents.

No. 8305.

United States District Court, E. D. Virginia, Norfolk Division.

Jan. 11, 1971.

Roy L. Sykes, Jr., Norfolk, Va., for libelant.

Steingold & Steingold, Norfolk, Va., and Paul S. Edelman, New York City, for intervenor.

Braden Vandeventer for James S. Darling and others.

Francis N. Crenshaw, Norfolk, Va., for South African Marine Corp., respondents.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

By an amended libel it is alleged that during the early morning hours of April 10, 1961[1] a collision occurred between the SOUTH AFRICAN PIONEER and the fishing trawler POWHATAN; as a result of which the POWHATAN was cut in two and sank. Only the master of the POWHATAN survived. The entire crew, including Gordon Chester

---

1. There is some reference to the collision and death as having occurred on April 7, 1961. We do not consider the date material at this stage of the proceedings.

McPherson (referred to herein as Chet), was apparently drowned. The collision took place approximately thirty-five (35) miles southeast of Cape May, New Jersey, under visibility conditions which were apparently restricted by reason of rain, rough seas, and heavy swells. It was undeniably a collision on the high seas.

Chet McPherson, as indicated above, was employed by the owners and operators of the POWHATAN. The action against these particular respondents is under the Jones Act, 46 U.S.C., section 688, which incorporates by reference the Federal Employers' Liability Act, 45 U.S.C., section 51, et seq. As to these respondents the libel also alleges a cause of action under the General Maritime Law, the Virginia Death by Wrongful Act statute, the New York Death by Wrongful Act statute, and the New Jersey Death by Wrongful Act statute.

The owners and operators of the SOUTH AFRICAN PIONEER are sued on the basis of the Death on the High Seas Act, 46 U.S.C., section 761, and the same allegations are made as to these particular respondents with respect to a cause of action under the General Maritime Law and the various state wrongful death statutes mentioned in the preceding paragraph. Additionally, the libel claims relief, as to the owners and operators of the SOUTH AFRICAN PIONEER, under the laws, statutes, and treaties of South Africa, as the SOUTH AFRICAN PIONEER flew the flag of South Africa and the South African Marine Corporation, Ltd., was organized and existed under the laws of South Africa.

The two causes of action stated in the libel allege negligence on the part of the owners and operators of both vessels, including a claim for the wrongful death and a claim for conscious pain and suffering prior to death.

After the action was instituted it developed that Chet had gone through a marriage ceremony with one Margie W. Marshall at Dillon, South Carolina, on November 14, 1959, about eighteen (18) months prior to his death. Margie W. Marshall had lived with Chet from the date of this marriage ceremony until his death, save and except a brief interlude of several weeks shortly prior to his death. However, at the time of death, they had rented an apartment in Hampton, Virginia. At all times following the marriage ceremony on November 14, 1959, they held themselves out to be husband and wife. Margie went by the name of "Ann" and we shall refer to her as such, although her legal name as of the date of Chet's death was Margie W. Marshall Dunlow. At all times Chet and Ann were permanent residents of and domiciled in the City of Hampton, Virginia. Their purported marriage in Dillon, South Carolina, was a one-day affair and, following the ceremony, the couple went to Fort Bragg, North Carolina, on their first night, and returned to Hampton, Virginia, on the following day. They remained in Hampton thereafter.

The original libel was filed for the benefit of "dependent relatives who have suffered pecuniary loss by reason of his death." After receiving information that Ann was asserting a claim as Chet's widow, the amended libel alleged that Chet "left surviving him next of kin and dependents, including but not limited to, his widow if any, his children if any, and his mother, father, brothers and sisters, all of whom have suffered pecuniary loss by reason of his death." By an appropriate order Ann was granted leave to intervene.

The respondents have filed a motion to dismiss directed to Ann's claim. They stated, in effect, that the mother and father of the decedent are the only parties eligible to receive any benefits by reason of any settlement or litigation.

Hearings were conducted as to Ann's status and her right to recovery. The facts are as hereinafter stated and the motion to dismiss will be treated as a motion for summary judgment and/or a pretrial hearing on the right of Ann to participate in any recovery.

Chet and Ann first met and started keeping company in the spring of 1959. At that time Ann was married to, but separated from, Dutie M. Dunlow whom she had married on October 10, 1952. No divorce or legal separation proceedings were then pending.[2] On September 30, 1959, Chet and Ann went to the office of John W. Maddy, an attorney in Hampton, Virginia, for the purpose of arranging a divorce for Ann. The attorney, after obtaining the basic information, accepted a cash payment retainer fee of $75.00 (apparently paid by Chet, although the receipt is made out to "Margie Dunlow") giving his receipt for same which indicated that a balance of $100.00 was still due. According to Ann, the attorney said that he would start the divorce "right away" and that the balance of $100.00 could be paid "as I could." She also stated that, prior to going to South Carolina for the purpose of entering into a marital contract with Chet, she telephoned the attorney who purportedly told her "to go ahead and get married, that everything was all right." Acting upon this alleged advice, Ann assumed that she was legally divorced from Dunlow. At no time prior to November 14, 1959, had the attorney requested that she sign any papers and she admitted that she had not testified by deposition or otherwise in her divorce case.

The attorney, Maddy, while admitting that Chet and Ann had conferred with him on September 30, 1959, in contemplation of Ann's filing a divorce action against Dunlow, denies emphatically that he ever told Ann that she could marry Chet. In fact, Maddy testified that Chet and Ann gave the separation date with Dunlow as being March 16, 1959, and, realizing that any divorce on desertion and abandonment could not be obtained until the passage of one year, Maddy discussed a payment schedule of

the balance of $100.00 on his fee and costs, same providing for payments of $25.00 each on November 1, January 1, February 1, and the final payment in March when the absolute divorce could be obtained. Maddy stated that the parties discussed a payment in December and it was decided to forego same as money would be scarce during the Christmas month.

According to Maddy, he drew the complaint and notice to take depositions in late December 1959, or early January 1960. He had fixed the date for taking depositions on February 17, 1960. He claims to have called Ann where she worked at the Woodland Drive-In and asked her to pay the arrearage in payments due and come to his office the following day to sign the bill of complaint. Ann never appeared and the divorce action was never filed.

To the extent that it may be pertinent, we accept Maddy's denial that he ever told Ann that she was free to marry. A compelling factor in this decision is that Ann still owed Maddy the sum of $100.00 and, knowing the attorney involved, it is fundamental that he would never tell Ann that she could marry Chet with the knowledge that the $100.00 would not then be paid. Irrespective of the troubles of any attorney, we know that an attorney would never give such advice when he had full knowledge of the fact that the divorce action, which he had been retained to file, had never even been instituted. We hold, therefore, that Ann, at the time she went through the marriage ceremony with Chet, was not acting innocently in the belief that she had a legal right to marry Chet.

We likewise find that Chet was equally aware of the fact that Ann's divorce had not been obtained at the time they took their trip to Dillon, South Carolina, to go through a marriage ceremony.

2. On July 1, 1961—nearly three (3) months after Chet was drowned—Dutie M. Dunlow obtained an absolute divorce from Ann under the name Margie Willie Marshall Dunlow, on the grounds of wilful desertion and abandonment occurring on March 14, 1959. This divorce does not aid or detract from Ann's right to recover in this action.

The actual application for a South Carolina marriage certificate was not produced in evidence although the marriage certificate reflects that an application was filed with the Probate Court for Dillon County on November 13, 1959, at 2:00 p. m.[3]—a fact which, if it occurred, would suggest that Ann, Chet and Chet's brother were in Dillon, South Carolina, the day prior to the marriage, although Ann testified that she and Chet drove to Fort Bragg where Chet's brother thereafter drove them to Dillon with all three returning to Fort Bragg that same night. As further evidence that Chet was aware of the difficulties of contracting a marriage in Virginia, Ann testified that it was Chet's idea to go to South Carolina and that "He told me how you could get married down there." Immediately thereafter Ann modified the foregoing statement by saying, "He just wanted to go down there and wanted his brother to go to his wedding," even though he had approximately six brothers in the area of Hampton, Virginia.

We deem it unnecessary to resolve the apparent conflict in testimony as to Ann's purported conversations with Elsie L. McPherson, the wife of one of Chet's brothers. Elsie testified that, on one occasion, she accompanied Ann and Chet to Elizabeth City, North Carolina, where Ann and Chet were to be married but "everything was closed." Elsie also stated that she and Ann had discussed the fact that, after Ann's marriage to Chet, she knew that she was not legally divorced from Dunlow. Ann denies the Elizabeth City trip and the purported statements to Elsie. As we conclude that the preponderance of the evidence otherwise clearly points to Ann's awareness of her existing legal impediment to marry Chet, we need not pass upon the credibility of Elsie and Ann.

■■ Manifestly, the marriage ceremony between Chet and Ann did not create a putative marriage which is defined as a marriage which is forbidden by law but which was contracted in good faith and ignorance of the impediment on the part of at least one of the contracting parties. As stated in 2 Bouv. Law Dict., Rawle's Third Revision, p. 2774, three circumstances must concur to constitute a putative marriage; to-wit, (1) one of the parties at least must have been ignorant of the impediment, not only at the time of the marriage, but must also have continued ignorance of it during his or her life, because if he became aware of it he was bound to separate himself from his wife, or vice versa; (2) the marriage must be duly solemnized; and (3) the marriage must have been considered lawful in the estimation of the parties or of that party who alleges the *bona fides*. Obviously (1) and (3) above have not been met. We hold that only a meretricious relationship existed between Ann and Chet under the facts here presented, although we find that Ann, at the time of Chet's death, was in fact dependent upon him for support irrespective of how that dependency relationship was created, and we further find that people in the community generally regarded the marriage as lawful.

■■ We are not concerned with a common law marriage. We are told that South Carolina recognizes same, but the marriage was never consummated by Ann and Chet living together in South Carolina. Even if we were to assume that South Carolina law is applicable, there could have been no common law marriage in this case as there was an existing legal impediment which was not removed until after Chet's death.

3. Generally applications for marriage licenses will require the parties contemplating marriage to state their status; i. e. single, widow or widower, or divorced. Ann testified that she and Chet gave the information "over the phone" and thereafter "we walked in, we were married and we left." The marriage ceremony, according to Ann, was performed at 8:30 p. m. or 9:00 p. m. on the night of November 14, 1959. It is abundantly clear from Ann's testimony that the parties never spent any night of their alleged married life in South Carolina.

Virginia does not recognize a common law marriage if celebrated there, Heflinger v. Heflinger, 136 Va. 289, 118 S.E. 316 (1923). Irrespective of the Virginia law relating to common law marriages, it is recognized that knowledge of the impediment by both parties will prevent any implementation of the common law marriage. Metropolitan Life Insurance Company v. Holding, 293 F. Supp. 854, 857 (E.D.Va., 1968).

From the testimony, if we were required to decide this case based solely upon dependency, it is clear that Ann was dependent upon Chet at the time of his death. It is also true that Chet's father and mother were partially dependent upon him for support. At this stage of the proceedings it is unnecessary to determine the extent of the dependency as to any of the parties, except to note that Chet's brothers and sisters were not dependent upon him in any manner, and that he had no children born as a result of either of his two marriages.[4]

Ann's counsel urge the court to protect her dependency claim under the Jones Act, the Death on the High Seas Act, the General Maritime Law, and the South African law as to any claim against the South African owners and operators.

■ As to the owners and operators of the fishing vessel, POWHATAN, we think it clear that the libelant had a right to maintain this action under the Death on the High Seas Act *or* the Jones Act. Gillespie v. United States Steel Corp., 379 U.S. 148, 155, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964), interprets the Jones Act as giving such a right "regardless of the location of the injury or death." Moreover, the Death on the High Seas Act does not preclude a remedy for wrongful death under general maritime law in situations not covered by the latter act. Moragne v. States Marine Lines, 398 U.S. 375, 402, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). The last cited case, as we know, permits a recovery for death occasioned by unseaworthiness, unaccompanied by any act of negligence, under general maritime law where the death occurs in the jurisdictional waters of a state which does not recognize unseaworthiness as a basis for recovery under a state wrongful death statute.[5]

■ Manifestly a cognizable claim lies in libelant's action under the Death on the High Seas Act against the owners and operators of the SOUTH AFRICAN PIONEER.

It is equally clear that, as to the SOUTH AFRICAN PIONEER, no action can be maintained under the Jones Act as the owners and operators of this vessel were not the employer of the decedent at the time he drowned. We doubt that *Moragne* was intended to give an alternative remedy under general maritime law where the obvious right to maintain an action exists under the

---

4. The father's deposition reflects that Chet was first married to one Bee Mingee about 1951 or 1952, and that this marriage was terminated by a divorce before Chet met Ann in the spring of 1959. Chet and his first wife had no children, but the wife had two sons by her prior marriage to one Hogg. There is no suggestion that Chet adopted these two children.

5. *Moragne* deals with the complexity of issues which will arise by simply stating: "In most respects the law applied in personal-injury cases will answer all questions that arise in death cases," 398 U.S. at 406, 90 S.Ct. at 1790. However, *Moragne* does not decide the important issue as to the determination of the beneficiaries who are entitled to recover. By intimation, at least, it is suggested that the "any person" provision of the Death on the High Seas Act is controlling. We believe, however, that under existing law as interpreted by judicial decisions the intervenor cannot be considered a beneficiary under the Jones Act, the Death on the High Seas Act, the general maritime law, or either of the three state wrongful death statutes. There remains for consideration the intervenor's right to be considered a beneficiary in her claim against the owners and operators of the SOUTH AFRICAN PIONEER.

Death on the High Seas Act or Jones Act.

■ If we are to confine our discussion to the intervenor's right to participate as a beneficiary with respect to any recovery under the Jones Act, the Death on the High Seas Act, or any of the three state wrongful death statutes, we believe that the law is well settled that Ann McPherson cannot participate in any recovery, in whole or in part. It is unnecessary to consider the three state wrongful death statutes under the factual situation here presented, although it may be said in passing that the state statutes in question would not afford relief to the intervenor. Clearly, a state wrongful death statute would not be applicable to a situation where the right to maintain an action has been expressly granted under the Jones Act and the Death on the High Seas Act.

■ We turn first to the Jones Act [6] in considering Ann's right to recover and/or participate in any award or settlement. The identical issue in essentially the same factual context was before this court in Bell v. Tug Shrike, 215 F.Supp. 377 (E.D.Va., 1963). On appeal, 332 F.2d 330 (4 Cir., 1964), cert. denied, 379 U.S. 844, 85 S.Ct. 84, 13 L.Ed.2d 49 (1964), the then Chief Judge Sobeloff discusses the problems presented where there is admittedly no problem of competing claimants, the dependency of the alleged widow was conceded, and the community regarded the parties as husband and wife. Rejecting these contentions and affirming the trial court, Chief Judge Sobeloff has this to say on the subject of dependency (332 F.2d at 336):

"There is a certain appeal in the argument of the appellant that if she was actually dependent upon the deceased seaman she should be entitled to recover, especially as there is no other woman claiming as a widow. But the statute does not spread its benefits broadly according to dependency. Relationship is an essential factor under the statute, which speaks of a 'surviving widow.' Neither express language in the statute nor the term 'widow' in its ordinary use qualifies the survivor of a bigamous marriage as a widow. If the statute made only pecuniary loss the test rather than relationship, we would have a different case. * * *

"Whether it would be sounder social policy to relax the statutory requirement of widowhood by treating the survivor of a bigamous marriage as a widow entitled to recovery is a fairly debatable question. But should such a change in policy be made on judicial initiative? It is one thing for admiralty to fill in the lacunae left by congressional silence; it would be quite another to rewrite the statute. It seems to us that an admiralty court would overstep proper limits if it should attain the result by giving a forced and artificial definition to the well-established term 'widow.' This would be the case were we to recognize as a wife a woman who goes through a marriage ceremony with a man knowing that he has an undivorced wife in being.

"While it is true that in the present instance no other woman is competing with the appellant for a share in the settlement fund, a decision according the appellant standing could operate to the detriment of claimants such as parents or next of kin in future cases."

Since *Bell* was decided in 1964, we know of no other authority from the Fourth Circuit or the United States Supreme Court which would suggest that

6. With respect to the decedent's employer, we hold that a recovery may be had under either the Jones Act or the Death on the High Seas Act. Whitaker v. Blidberg-Rothchild Co., 195 F.Supp. 420 (E.D. Va., 1961), affirmed 296 F.2d 554 (4 Cir., 1961).

*Bell* is no longer the law.[7] Thus, as to any claim under the Jones Act, *Bell* is controlling.

As to the claim under the Death on the High Seas Act, while Lawson v. United States, 192 F.2d 479 (2 Cir., 1951), cert. denied, 343 U.S. 904, 72 S. Ct. 635, 96 L.Ed. 1323, was mentioned in footnote 13 in *Bell*, admittedly the Death on the High Seas Act was not before the court in *Bell*. The statute, 46 U.S.C., section 761, provides a right of recovery "for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued."

*Lawson*, supra, was decided some years after Middleton v. Luckenbach S. S. Co., Inc., 70 F.2d 326 (2 Cir., 1934), which is relied upon by Ann's counsel. *Middleton* dealt with the rights of illegitimate children under the Death on the High Seas Act. *Lawson*, decided by the same Second Circuit, held that even a *putative* wife had no rights under the Death on the High Seas Act. While it is true that, in *Lawson*, there were competing "wives," we do not find this to be a significant point when we analyze the opinions in *Lawson* and *Bell*. There is nothing to indicate that the legislative intent was to confer a benefit upon anyone other than the lawful relatives of the deceased; nor is it intimated that mere proof of dependency is sufficient. As *Lawson* says (192 F.2d at p. 481):

"The right conferred is not for the benefit of all dependents but only for dependent relatives. The 'putative' wife is not a 'relative' in common parlance."

While we are aware of opinions which allow recovery to lawful widows even where no actual dependency is shown, and likewise to putative widows under the Longshoremen's and Harbor Workers' Compensation Act, we find no authority overruling *Lawson*, or even suggesting that it should be overruled. We hold that *Lawson* is controlling and that Ann cannot recover under the Death on the High Seas Act in a court in the United States.

Finally, and *only* with respect to the owners and operators of the SOUTH AFRICAN PIONEER,[8] we have a more troublesome question. While Ann's counsel wanted to prove the South African law, counsel for the South African vessel and its owners and operators insisted that the preliminary question as to Ann's right to participate in any recovery be first decided. The file does contain extracts of South African law which lead to the initial belief that a *putative* wife may possibly recover under South African law, but we cannot make any finding to this effect in the absence of any stipulation as to the South African law. If it develops that a *putative* wife may recover under South African law, but one who is not a *putative* wife cannot participate in any recovery, the matter would be ripe for a final decree upon the entry of a stipulation to this effect as the court has found that Ann was not a *putative* wife. If counsel desire to appeal from an interlocutory order, it is recognized that an appeal may save the expense of proving South African law.

7. In Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968), and Glona v. American Guarantee Co., 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), the rights of illegitimate children to recover for the death of their mother (Levy), and the right of the natural mother to recover for the death of her illegitimate son (Glona), were upheld, despite state statutes to the contrary, as being in violation of the Equal Protection Clause of the Fourteenth Amendment. We know of no such constitutional right which could be successfully asserted by Ann under the facts of this case.

8. We know of no authority which holds that the personal representative of an American seaman, killed aboard an American vessel as a result of a collision on the high seas with a foreign vessel, can maintain an action against his American employer under the law of the flag of the foreign vessel. Manifestly this could not have been intended by Congress in enacting either the Jones Act or the Death on the High Seas Act.

We have no knowledge of the facts other than stated herein. It may be that the SOUTH AFRICAN PIONEER was solely at fault; the collision may have been the result of mutual fault of the POWHATAN and the SOUTH AFRICAN PIONEER. We do not resolve these questions.

The sole issue with respect to the liability of the SOUTH AFRICAN PIONEER, its owners and operators, is whether the personal representative of a deceased American seaman could recover under South African law against the South African vessel and/or its owners and operators in a court of the United States, and whether Ann would be eligible to participate in such recovery under South African law.

Cases are legion to the effect that the courts of the United States have entertained causes of action in admiralty and applied foreign law. When the foreign law is presented, there is no insurmountable difficulty in applying same.

The Death on the High Seas Act creates a right of action under the law of the United States for deaths on the high seas, 46 U.S.C., section 761, and it is also significant that 46 U.S.C., section 764 preserves any right of action given by foreign law for death on the high seas and permits an action to be brought in the admiralty courts of the United States based upon such foreign law. South African Marine Corporation argues that the Death on the High Seas Act merely codified the doctrine of the law of the flag by making the Death on the High Seas Act applicable to deaths occurring on foreign flag vessels, and that 46 U.S.C., section 764 was not intended to grant a cause of action under foreign law for the death of an American seaman on board an American vessel which collides with a foreign vessel.

There is, admittedly, some suggested support for this argument. Noel v. United Aircraft Corp., 191 F.Supp. 557 (D.Del., 1961); Bergeron v. Koninklijke Luchtvaart Maatschappij, N.V., 188 F. Supp. 594 (S.D.N.Y., 1960); Norris, The Law of Seamen, section 652 (1962); Note: 67 Yale L.J. 1445, 1447 (1958). The cited cases, however, relate to deaths upon foreign airlines and, therefore, the precise issue here presented has not been settled.[9]

In THE JAMES MC GEE, 300 F. 93 (S.D.N.Y., 1924), members of the crew of a vessel owned and operated by the United States were killed when the vessel was struck by a ship owned by a New Jersey corporation. In an action brought against the New Jersey owners under the New Jersey Wrongful Death Act, Judge Learned Hand said (300 F. at p. 96):

"There is no reason why a sovereign should not undertake to impose on persons domiciled within its borders obligations conditioned on events occurring on the seas, since there is no other sovereign with whom its will conflicts. Therefore the question comes merely to whether the sovereign of the domicile has clearly enough indicated such a purpose. If so, there is as much reason why the court of another sovereign before whom the case arises should recognize those obligations, and impose similar ones, as though the events in question had arisen within the borders of the sovereign of the domicile."

The MC GEE rationale has been followed in THE PRESIDENTE WILSON, 30 F.2d 466 (D.Mass., 1929), wherein libels in behalf of deceased seamen of a United States fishing schooner were permitted to be filed against an Italian steamship alleging Italian law. See also, Powers v. Cunard S.S. Co., 32 F.2d 720,

9. In THE HAMILTON, 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907), it was held that crew members killed as a result of a two-ship collision could sue the vessel on which they were not employed, notwithstanding the fact that the collision occurred on the high seas. However, both vessels were owned by Delaware corporations and the court was not called upon to decide whether it was relying upon the law of the decedent's domicile or the tortfeasor's domicile.

(S.D.N.Y., 1925), and THE BUENOS AIRES, 5 F.2d 425 (2 Cir., 1924).

The converse of the present situation was before the court in Fernandez v. Linea Aeropostal Venezolana, 156 F.Supp. 94 (S.D.N.Y., 1957). A stewardess on a foreign airline was killed in a crash at sea. When an action was brought under 46 U.S.C., section 761, the respondents contended that such action could only be maintained under 46 U.S.C., section 764, as the death occurred outside the territorial limits of the United States. The court, holding otherwise, is clear authority for the point that Sections 1 and 4 of the Death on the High Seas Act should not be limited strictly to deaths occurring on American and foreign flag vessels, respectively.

The difficulty confronting any court where the place of the tort can no longer be considered controlling is understandingly complex. Should the law of the plaintiff's domicile, or the domicile of the decedent, control? Should we look to the law of the forum? Are there alternatives available to a party bringing the action? Clearly the law of the forum and the law of the domicile of Ann, Chet or the personal representative will not avail Ann any relief.

The owners and operators of the SOUTH AFRICAN PIONEER can hardly be heard to complain as to the prospect of having its rights and liabilities determined by South African law, where the corporation was incorporated and its principal office is located. We do not suggest that Ann has any remedy under South African law. We merely hold that the question of her right, if any, to participate in any recovery for the death of the decedent under South African law cannot be summarily dismissed without knowledge of what that law is. Presumably, an action could have been filed against the South African corporation in the courts of South Africa.

Our basic reason for declining to hold that the Death on the High Seas Act limits the operation of 46 U.S.C., section 764, to deaths occurring on board a for-

eign flag vessel is apparent from the inequity which may result in such a situation. If the evidence developed that the SOUTH AFRICAN PIONEER was solely at fault, it would seem grossly unjust to deny the benefit of any remedy available under South African law. Such a holding would be contrary to the teachings of *Moragne*, supra, which holds that the Death on the High Seas Act was not intended to preclude the availability of a remedy for wrongful death under general maritime law in situations not covered by the act. We reject, however, any theory that Ann would be entitled to a recovery under the South African Workmen's Compensation law as the decedent was not employed by the South African corporation.

Counsel will present an appropriate order in accordance with this memorandum.