BELL TRANSPORTATION COMPANY v. ORVILLE MOREHEAD.

5-4775                                        437 S.W. 2d 234

Opinion Delivered February 17, 1969

*William H. Drew* and *Wright, Lindsey & Jennings* for appellant.

*Sam Robinson* and *McMath, Leatherman, Woods &
Youngdahl* for appellee.

CONLEY BYRD, Justice.  Appellee Orville Morehead
was awarded a $165,000 judgment upon a jury verdict
against appellant Bell Transportation Company for in-
juries sustained in connection with the use of Bell's tan-
dem truck and lowboy.  Since the asserted liability
against Bell must rest upon the doctrine of respondeat
superior, Bell contends that it was entitled to a directed
verdict on the ground that its regular driver Sebastian
Carrior and its supervisor J. C. Melton were borrowed
servants in the employ of Houston Contracting Co. at
the time of Morehead's injury.

The record shows that Houston Contracting Co. was
involved in a "change out" of engines at Tennessee Gas
Transmission Co. compressor stations.  The engines
had been removed from their foundations, sent back to
the factory to be reworked and then brought back to be
reinstalled in the compressor stations.  The engines
were moved in halves.  Each half weighed about 80
tons.  Bell is engaged in heavy hauling in Louisiana
and 21 other states.  It operates under an Interstate
Commerce Commission permit.  For deliveries, Bell
charges the regular tariff prescribed by ICC regulations.
The bill of lading signed by Houston called for Bell to,
"furnish one tandem truck and one 16 wheel lowboy and
one supervisor to work as instructed".  The truck and
lowboy was driven by one Sebastian Carrior to a rail-
road siding, accompanied by J. C. Melton, Bell's super-
visor, in another vehicle.  There, the Houston Con-
tracting Co. moved the half motor from a flat car to the
lowboy, which Sebastian Carrior drove to the compres-
sor station.  In the course of attempting to back the
lowboy up a ramp to the platform at the compressor
station onto which the half motor was to be unloaded,
the drive shaft on Bell's truck broke, making it impossi-
ble to move the rig under its own power.  A cable from
a winch truck was tied to the lowboy through a block

and tackle arrangement and the lowboy was winched to within a few feet of the platform. The winch truck was operated by Danny Williams, an employee of Houston, and signals were given him by J. E. Morehead, Houston's assistant superintendent. Signals and orders to the truck driver, Carrior, were relayed by J. C. Melton, Bell's supervisor. When the truck had been winched to within 4 or 5 feet of the platform, it was discovered that the cable was fouling against the platform causing a loss of power. In order to accomplish a higher hitch on the lowboy it was necessary to secure slack on the cable. The winch truck operator begin to roll off cable from his drum and appellee Morehead was instructed to pick up the cable to gather up the slack. While appellee Morehead was so engaged, Sebastian Carrior permitted the truck to roll forward. The cable in Morehead's hands was immediately stretched taut, flinging him against the platform and inflicting the injuries complained of.

Sebastian Carrior had been Bell's employee for 15 years. He testified that during the winching operation, he sat under the wheel of the truck to steer and brake when necessary, that the flagman who signaled him to put on his brakes was Mr. Melton, Bell's supervisor and his immediate superior. He said that when he left Bell's office on the morning of the accident, he knew where he was going. They told him to go to Port Sulphur and pick up the engine at the railroad siding and move it to the building where it could be unloaded into the building. Mr. Melton went along as his supervisor to see that he hauled it in the proper manner.

Mr. J. C. Melton testified that after the truck would not operate under its own power, Mr. Edwards, Houston's job superintendent, Mr. J. E. Morehead, Houston's assistant job superintendent and appellee's brother, Houston's millwright foreman and he were all talking and trying to figure out some means of winching the lowboy back into the building. The winch truck and a

D8 tractor were hooked up to the trailer. He was standing at the left front door of the truck flagging it. Mr. J. E. Morehead was standing on the platform where he could see him for purposes of signalling. He was taking orders from Mr. Jesse Morehead. Appellee Morehead was hurt when they let the truck roll ahead approximately 3 or 4 feet on a signal from Jesse Morehead. He said that at all times after the driveshaft broke he was taking orders from Jesse Morehead. On cross examination Mr. Melton stated that the tandem truck and lowboy could cost as much as $50,000 and that he was sent along as supervisor to help protect that equipment. They couldn't turn special equipment like that over to just anybody to use as they might see fit. He actually supervised the transporting of the equipment from the railroad track to the pumping station. That was his and Bell's business there and he hadn't worked for anybody but Bell Transportation Company. Mr. Bill Edwards was superintendent for Houston Contractors and J. E. Morehead was assistant superintendent. He was taking his orders from Mr. J. E. Morehead.

Mr. William R. Edwards, a witness for Bell, testified that J. E. Morehead was directing the movement of the trucks and the entire operation from the platform outside the building; that the Bell truck was under the direction of Houston Contracting Co. from the time it arrived until it left and that he represented Houston and directed the truck in its use. That Mr. Melton who was with Bell was under his supervision and control and Houston was responsible for moving the engines and installing them. Later, however, Mr. Edwards testified that he told the truck driver and supervisor where to go with the truck to get the machinery and where to take the machinery. That Bell had the people, experience and equipment to do the job and that Mr. Melton was in charge of the truck—he was there to see that the truck was operated in the proper manner. The charge for the use of the truck was on an hourly

basis in accordance with the ICC tariff. He didn't attempt to give the truck driver or Mr. Melton, the supervisor, any orders or tell them anything about the details of the work. Mr. J. E. Morehead was supervising the operation, but he didn't attempt to give these fellows any orders. They were hired to come down there and move that engine from the rail point to the compressor station. They never did get it back to the platform where it could be unloaded before appellee Morehead was injured.

Since this accident occurred in Louisiana, we must apply our procedural law and the substantive law of Louisiana. Of course under our procedural law, we need only look to see if there was sufficient evidence to go to the jury. The substantive law of Louisiana on the borrowed servant doctrine is extensively set forth in *Benoit* v. *Hunt Tool Co.*, 219 La. 380, 53 So. 2d 137 (1951).

The Supreme Court of Louisiana in the Benoit case discussed the usual tests for determining the borrowed servant doctrine—i.e., "whose business" test and the "control" test. In applying these tests the court there recognized that if there was a division of control between the employer lending the servant and the employer borrowing the servant, the borrowed servant doctrine could not apply. From the testimony of Bell's witnesses set out above, we find that there was substantial evidence from which the jury could have found that Bell's employees were conducting themselves in pursuance of their master's business and under their master's control—more particularly that control as to the protective custody of their master's equipment. Bell takes the position that the only way the winching operation could be done properly was for someone to direct and control all phases of the operation and that the evidence conclusively shows that this control was under the supervision of Houston Contracting Co. This argument fails to take into consideration the distinction between

the authoritative direction and control involved in the master-servant relationship and that direction with which one necessarily cooperates in executing a common plan for a larger undertaking. To the same effect see *The Standard Oil Co.* v. *Anderson* 212 U.S. 215, 29 S. Ct. 252, 53 L. Ed. 480 (1909).

Bell's second point for reversal is that the trial court erred in giving its instruction No. 11 (AMI 702). This instruction reads as follows:

"I have used the term 'scope of employment' in these instructions.

"An employee is acting within the scope of his employment if he is engaged in the transaction of business which has been assigned to him by his employer or if he is doing anything which may reasonably be said to have been contemplated as a part of his employment and is in furtherance of his employer's interests".

Bell's third point for reversal is that the court erred in giving its instruction No. 12 (AMI 703). This instruction reads:

"The vehicle driven by Sebastian Carrior was owned by Bell Transportation Company, and Sebastian Carrior was a regular employee of Bell Transportation Company. You may consider these facts along with any other evidence in the case in deciding whether Sebastian Carrior was acting as an employee of Bell Transportation Company and within the scope of his employment at the time of the occurrence".

In its brief Bell argues these two instructions together. It contends that each was abstract, improper and highly prejudicial and that taken together the two instructions prevented Bell from having the borrowed

servant defense considered fairly by the jury. To fortify its position Bell points out that the trial court upon Bell's request instructed the jury as follows:

"As the general employer of J. C. Melton and Sebastian Carrior, Bell Transportation Company has the burden of proving by a preponderance of the evidence that, as to the particular work in question, the relationship of master and servant between Bell Transportation Company and its employees had been suspended and that a new relationship of master and servant had been created between them and Houston Contracting Company, which gave Houston Contracting Company the right to control them, with right of control being relinquished by Bell Transportation Company."

We find Bell's position to be without merit. Appellee Morehead's theory of the lawsuit at all times was that J. C. Melton and Sebastian Carrior were employees of Bell and at all times acting within the scope of their employment for Bell. Thus, even under Bell's defense on borrowed servant, Morehead was still entitled to have his theory of the lawsuit explained to the jury together with the indicia or guides by which the jury could determine whether Melton and Carrior were acting within the scope of their employment for Bell or had suspended the same for a new relationship with Houston. We find nothing in the instructions that is abstract or conflicting with the borrowed servant doctrine.

Bell's last argument is that the verdict is excessive. The record shows that Morehead had an annual earning capacity in excess of $14,000 per year with a life expectancy of 24.41 years from date of trial. Some 17 months had elapsed from injury to the date of trial. He was in the hospital a total of 34 days, was bedfast for more than 60 days and in addition to a permanent back injury, suffered a hernia, for which he underwent an operation. His medical expenses to the date of trial

were $2,742. There was testimony that Morehead in the future would have to undergo a back operation resulting in additional medical expenses of $2,400. Bell's doctor, who examined Morehead for purposes of trial, gave Morehead a 35% disability to the body as a whole and in addition theorized that in terms of occupational disability, Morehead could well be described as totally disabled.

We believe that there was substantial evidence from which the jury could find that appellee Morehead was totally and permanently disabled from an injury which would cause him additional pain in the future. Upon the record we are unwilling to say that the verdict in the amount of $165,000 was excessive.

Affirmed.