**Evelyn Rhonda THOMPSON et al., Plaintiffs,**

v.

**The OFFSHORE COMPANY et al., Defendants.**

**Civ. A. No. 74–H–1632.**

United States District Court,
S. D. Texas,
Houston Division.

July 7, 1977.

Ira Watrous, Watrous & Conner, Inc., Houston, Tex., Garnet E. Norwood, De-Queen, Ark., for plaintiffs.

Gus A. Schill, Jr., Royston, Rayzor, Vickery & Williams, Houston, Tex., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. STATEMENT OF CASE

CARL O. BUE, Jr., District Judge.

On the evening of October 8, 1974, the No. 4 leg of the Drilling Rig GEMINI suddenly gave way in the Gulf of Suez, thereby tilting the drilling platform and causing nineteen men and the approximate 400 ton drilling rig equipment package ("rig package") within which they were working to slide off the platform into the Gulf 25 feet below. Eighteen of the nineteen men aboard died, including four American citizens. This action is brought by the survivors of the four American decedents to recover the damages sustained as a result of their deaths. The defendants have stipulated liability.

The cause proceeded to trial before the Court on the issue of damages and after hearing testimony of witnesses, considering the exhibits and depositions offered into evidence and hearing the arguments of counsel, the Court now makes and enters its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

### II. FINDINGS OF FACT

1. Plaintiffs are citizens of the United States of America. Defendant Offshore International, S.A., is a Panamanian corporation and a wholly-owned subsidiary of defendant The Offshore Company, a Delaware corporation.

### A. The Accident

2. The four Americans working aboard the Drilling Rig GEMINI on the evening of October 8, 1974, were John Hayes, Troy Eaton, Edwin Jones and Larry Reel. It was dark outside. The evidence establishes that the events culminating in their deaths occurred suddenly. According to Arnold Feller, who as the Senior Field Superintendent of the GEMINI was aboard the TENDER 21, a structure containing living quarters adjacent to the drilling platform, the rig package, consisting of pipe, girders from the derrick and other structures, tore loose from its position on the platform and slid off the edge and into the ocean below within eight to ten seconds of the No. 4 leg's initial collapse.

3. An Egyptian employee had just walked from the platform to the adjacent TENDER 21 to get water. Although he witnessed the casualty, no evidence has been introduced that he observed or heard any of the men in the water below following the platform's capsize. All men on the TENDER 21 immediately joined in a search from life rafts for any survivors in the water. See Plaintiffs' Exhibits 23, 24 and 28. Other vessels and helicopters also joined in the search. One Egyptian employee was pulled from the water. None of the other 18 men were located on this initial search effort, which covered several hours.

4. The drilling platform itself slowly collapsed and drifted with the prevailing three knot current for approximately four miles over the next four hours until being recovered. Given an approximate wind of five miles per hour, Mr. Feller estimated that the ocean in the vicinity of the accident consisted of two-foot waves at six-second intervals.

5. The bodies of John Hayes, Troy Eaton and Edwin Jones were never found, and their exact cause of death is therefore unknown. An autopsy indicates that Larry Reel, whose body was recovered, died of asphyxia caused by drowning. See Plaintiffs' Exhibit 3.

6. Dr. Joseph Jachimczyk, Chief Medical Examiner for Harris County, Texas, and expert in the field of forensic pathology, testified that death by drowning is not immediate and that men possessing the physical capabilities of these four decedents would survive for some time in the water before drowning, if that were the cause of death.

7. It is not known whether any of the four decedents consciously survived the fall into the water or whether the impact of their fall, coupled with the fall of the approximate 400 ton rig package which they were aboard, rendered them unconscious upon impact. Thus, there is no evidence of a struggle for life on the part of any of the four decedents.

### B. The Four Decedents and Their Survivors

#### 1. John Hayes

8. At the time that he was killed on October 8, 1974, John Hayes was ten days short of his 52nd birthday, with a life expectancy of 21.8 years and a work life expectancy of 13.3 years. *See* Defendants' Exhibits 1 and 2. He was survived by two children: Evelyn Rhonda Hayes Thompson, age 25 at the time of his death, and Mark Hayes, 17 years of age at that time. Hayes was divorced in 1966, his son Mark thereafter lived with the former Mrs. Hayes until joining the Navy in November, 1974, and his daughter Rhonda had been married since 1968.

9. John Hayes was first employed by the defendants in 1968 and had worked overseas from 1968 until his death. Rhonda Thompson testified that Hayes would visit her and her brother one to two weeks every two years and that he wrote her twice a month. Neither child visited Hayes while he was employed outside the United States.

10. Because his daughter had been married since 1968, Hayes did not provide any periodic support for her, but did make monetary gifts to her approximating $1,000.00 each year. The credible evidence further establishes that Hayes provided $200.00 monthly support for Mark, or $2,400.00 annually, *see* Defendants' Exhibit 18, and more likely than not would have continued such payments until Mark reached majority. Hayes also bought his son a car during 1974. Hayes did not list Mark as a dependent for income tax purposes. *See* Defendants' Exhibit 13.

11. Hayes was employed as a toolpusher at an annual salary in 1974 of $28,800.00, including seniority, overseas service bonus and an overseas cost-of-living allowance. Pay records reflect the following annual earnings from 1969 through 1973:

| Year | Earnings |
|------|----------|
| 1969 | $18,743.87 |
| 1970 | 14,219.35 |
| 1971 | 21,176.29 |
| 1972 | 17,451.23 |
| 1973 | 24,598.77 |

*See* Defendants' Exhibit 6. At the time of death, Hayes' gross estate was valued at $17,766.68, all but $125.00 of which represented cash savings in a bank account. *See* Defendants' Exhibit 26. His net estate of $14,000.00 was divided evenly between his two children.

12. Considering his age, his prior earnings record since 1968 and the testimony of Dr. John Allen, an economics teacher at Texas A & M University, and Mr. Noah Mead, Director of Personnel, Training and Safety for defendant The Offshore Company, the Court finds that Hayes' earnings over the remainder of his 13.3 work life expectancy, excluding increases attributable to inflation, would approximate $30,000.00 yearly. Given the $14,000.00 net value of his estate upon death, as compared to his annual earnings to that date, and recognizing that any comparable savings amassed up to retirement would be significantly depleted by Hayes for living expenses during a minimum retirement period of 8.5 years, the Court finds, based on this record and the lack of evidence as to any retirement benefits available to the decedent, that his inheritable estate at death, in addition to the $14,000.00 previously distributed to his survivors, would have been $30,000.00. Thus, each child would have an inheritance expectancy, in addition to the

$7,000.00 previously received, of $15,000.00. Such a sum, discounted to present value at 5 percent in accordance with Hayes' life expectancy of approximately 22 years, approximates $5,000.00.

13. Mark Hayes is entitled to recover for loss of support at $200.00 per month for a four-year period. Discounted at 5 percent for future payments, this sum equals approximately $10,000.00. The Court further awards Mark Hayes $2,000.00 for loss of nurture.

In view of evidence of monetary gifts made by Hayes to his children, Rhonda Thompson and Mark Hayes each are awarded after discount at 5 percent the sum of $10,000.00 of this pecuniary loss.

14. For loss of their father's society, and taking all pertinent factors into account, Rhonda Thompson and Mark Hayes each are entitled to recover $15,000.00.

### 2. Troy Eaton

15. At the time of his death, Troy Eaton was 40 years of age with a life expectancy of 31.5 years and a work life expectancy of 23 years. See Plaintiffs' Exhibit 21. He was survived by his wife, Mrs. Louzelle Eaton, age 46 with a life expectancy of 32.8 years, see Defendants' Exhibit 1, and four children by a prior marriage: Johnnie June, 20; Ricky, 18; Drinda, 15; and Mandie, 9.

16. Troy Eaton's prior marriage to Thelma Louise Eaton ended in divorce in January, 1971, and he married Louzelle Eaton in May, 1971. Eaton had been employed overseas since 1968 and following his marriage to Mrs. Eaton in May, 1971, he returned to the Middle East. Mrs. Eaton thereafter joined him in Malta, and they remained abroad until December, 1972, when Mrs. Eaton returned to Wichita Falls, Texas. Eaton visited his wife in March, 1973, and he returned to the United States from overseas assignment during June of that year.

He and Mrs. Eaton worked and lived together in Wichita Falls until February, 1974, at which time Eaton entered into defendants' employ as a toolpusher overseas. The day prior to his departure, he and Mrs. Eaton signed an earnest money contract for the purchase of a 270 acre wheat farm. Mrs. Eaton visited the decedent in Cairo for three or four days during July, 1974. She testified that the purpose of the visit was to verify the monthly salary to which Eaton was entitled because the monthly checks she had received since February, 1974, were lower than what she had contemplated.

17. Following the divorce of their parents in 1971, Eaton's four children lived with their maternal grandparents. Johnnie June married in May, 1972, at age 17 and has her own family. Ricky quit school in the ninth grade, then worked as an oil field worker until he joined the Navy at age 18 in April, 1974. He presently works on an offshore drilling rig. Drinda and Mandie currently live with their mother and stepfather in Abilene, Texas.

18. Eaton saw very little of his four children during the approximate four-year period between his 1971 divorce and his 1974 death. Johnnie June, Ricky and Drinda testified that they generally saw their father every few months for a day at a time. During the period from March, 1973, until February, 1974, when Eaton was living in Wichita Falls, he visited them on a more regular basis. Ricky, Drinda and Mandie also stayed with their father and stepmother in Wichita Falls, but the visits were short because of friction between the children and Mrs. Eaton.

19. The uncontradicted evidence establishes that the total support payments made by Eaton to his four children were as follows:

| Year | Amount | Dependents |
|------|--------|------------|
| 1971 | $1,100.00 | Johnnie June, Ricky, Drinda and Mandie |
| 1972 | 1,850.00 | Ricky, Drinda and Mandie |
| 1973 | 1,275.00 | Ricky, Drinda and Mandie |
| 1974 | 210.00 | Drinda and Mandie |

See Defendants' Exhibit 10. Eaton made gifts to the children approximating $200.00 annually or $50.00 to each child.

20. Income tax and employment records reflect the following approximate income for Eaton from 1970 until October, 1974, at

which time his monthly income was $2,100.00:

| Year | Earnings |
|------|----------|
| 1970 | $16,000.00 |
| 1971 | 12,000.00 |
| 1972 | 14,000.00 |
| 1973 | 16,000.00 |
| 1974 | 14,000.00 |

*See* Defendants' Exhibits 7 and 14. Eaton's estate at death was valued at $1,675.00, consisting entirely of personal property. *See* Defendants' Exhibit 27. Not including the effects of inflation, the Court estimates that Eaton's annual earnings both at home and abroad would have averaged $18,000.00 over the remainder of his work life expectancy.

21. Ricky, Drinda and Mandie are entitled to recover for a pecuniary loss of nurture caused by their father's death. Given their respective ages, and in view of the history of the parent-child relationship in each instance following Eaton's 1971 divorce, Ricky is awarded $2,000.00, Drinda is awarded $4,000.00, and Mandie is awarded $8,000.00.

22. The four children may well have been deprived of a full inheritance expectancy in light of decedent's remarriage to Mrs. Eaton, whose life expectancy is actually longer than Eaton's. *See* Finding of Fact 15. The evidence also supports a small award for loss of support to Eaton's two youngest children, Drinda and Mandie. For loss of an appropriate inheritance expectancy and support, including gifts, and taking all factors contained in the evidence and discussed above into account, the Court makes the following awards, after discounting at 5 percent where appropriate:

| Child | Amount |
|-------|--------|
| Johnnie June | $ 7,000.00 |
| Ricky | 7,000.00 |
| Drinda | 12,000.00 |
| Mandie | 17,000.00 |

23. For loss of their father's society, each child is awarded $10,000.00.

24. Mrs. Eaton has suffered a pecuniary loss of support and services and the loss of a reasonable expectancy of a future inheritance of substantial assets not exhausted by the decedent and herself during retirement. For this total pecuniary loss, the Court finds that an appropriate award, assuming Mrs. Eaton's annual entitlement to one-half of the decedent's $18,000.00 estimated annual income over the remainder of his 23 year work life expectancy, discounted at 5 percent for future payments, is $150,000.00. The Court further awards Mrs. Eaton $25,000.00 for loss of her husband's society.

### 3. *Edwin Jones*

25. Edwin Jones was 28 years of age at the time of his death, with a work life expectancy of 34.2 years and a life expectancy of 43 years. *See* Plaintiffs' Exhibit 21. Jones was survived by his 56 year old father, with a life expectancy of 19 years, his 55 year old mother, with a life expectancy of 25 years, and three brothers and one sister. *See* Defendants' Exhibit 1. Only his mother and father seek to recover for Jones' wrongful death.

26. The evidence reflects a predictable pattern for Edwin Jones and his brothers. While living at home, each brother would pay $200.00 per month to their parents for room and board. Two sons have married and live near their parents. They no longer make financial contributions.

The decedent lived at home through his junior year of high school, then served in the Army for two years. He thereafter returned home to Dierks, Arkansas, and worked at different construction-related jobs prior to his employment with defendants in August, 1974, as a crane operator/roustabout foreman/floorman. *See* Plaintiffs' Exhibit 16. Up to the time of departure for Egypt, he lived at home with his parents.

27. Upon joining the Army, Jones opened a joint checking account with his mother. Mrs. Jones testified that the decedent intended to deposit $500.00 per month into this checking account during his employment with defendants and that she would be able to draw on this account as necessary. She further stated that she intended to accumulate as much in the account as possible.

28. The Court therefore finds that the decedent would have continued to provide support for his parents of $200.00 per month until he married. It is reasonable to assume, in light of the testimony and Defendants' Exhibit 4, that Jones would have married by his mid-thirties. Accordingly, Mr. and Mrs. Jones jointly are awarded $15,000.00, after discounting future payments at 5 percent, for loss of support and services.

29. Because of their respective ages, Mr. and Mrs. Jones could not reasonably expect to inherit the estate which the decedent would have amassed had he lived a normal life. Therefore, Mr. and Mrs. Jones have not been deprived of an inheritance expectancy as a result of their son's untimely death.

30. Taking into account the life expectancies of Mr. and Mrs. Jones at the time of their son's death, and all factors bearing on the relationship between them and the decedent, the Court awards Mr. and Mrs. Jones $10,000.00 each or a total of $20,000.00 for loss the their son's society.

### 4. Larry Reel

31. Larry Reel also was from Dierks, Arkansas. He signed up with Edwin Jones to work for defendants as a floorman and shared an apartment with him in Cairo. At the time of his death, Reel was 24 years of age and had a life expectancy of 46.4 years and a work life expectancy of 37.8 years. See Plaintiffs' Exhibit 21. He was survived by his parents, his mother being 58 years old with a life expectancy of 22.6 years, his father, 55 years of age with a life expectancy of 19.6 years, a step-brother, a step-sister and a full brother, all married. Decedent's father died one week before the trial in this cause. His parents seek a recovery for damages stemming from his wrongful death.

32. Subsequent to his graduation from high school, Reel attended college for one semester, served in the Army and thereafter worked for lumber and construction companies. Reel lived at home prior to going overseas in the fall of 1974, and although he did not make periodic payments for room and board, he did pay the family bills on occasion. Neither parent could approximate decedent's financial contributions on a monthly basis. See Deposition of Hillery Reel.

33. Before leaving for Egypt, Reel opened a joint savings account with his mother. It was understood that Reel would deposit $500.00 monthly into the account and that his mother would draw on the account only when necessary. Giving plaintiffs the benefit of the doubt, the Court finds that at the time of Reel's death, his parents suffered a loss of services and support, after discounting at 5 percent for future payments, of $15,000.00.

34. In light of the anticipated life expectancies of Mr. and Mrs. Reel at the time of their son's death, the Court finds that they could not expect to survive the decedent. Therefore, they did not possess a reasonable inheritance expectancy which was damaged by Reel's premature death.

35. Based on anticipated life expectancies, and taking all pertinent factors bearing on this particular parent-child relationship into account, the Court finds that decedent's parents suffered a loss of his society in the amount of $10,000.00 each or a total of $20,000.00.

36. The following damages therefore are awarded to the named individuals:

| Survivor(s) | Pecuniary Loss | Loss of Society | Total |
|---|---|---|---|
| Rhonda Thompson | $ 15,000.00 | $ 15,000.00 | $ 30,000.00 |
| Mark Hayes | 27,000.00 | 15,000.00 | 42,000.00 |
| Mrs. Troy Eaton | 150,000.00 | 25,000.00 | 175,000.00 |
| Johnnie June Eaton Bell | 7,000.00 | 10,000.00 | 17,000.00 |
| Ricky Eaton | 9,000.00 | 10,000.00 | 19,000.00 |
| Drinda Eaton | 16,000.00 | 10,000.00 | 26,000.00 |
| Mandie Eaton | 25,000.00 | 10,000.00 | 35,000.00 |
| Mr. & Mrs. Jones | 15,000.00 | 20,000.00 | 35,000.00 |
| Mr. & Mrs. Reel | 15,000.00 | 20,000.00 | 35,000.00 |
| TOTAL | $279,000.00 | $135,000.00 | $414,000.00 |

37. Payroll checks covering the wages due and owing the four decedents at the time of their death were submitted to the representatives of the respective estates in July, 1975. See Plaintiffs' Exhibits 17–20. Plaintiffs have opted not to negotiate the wage checks received from defendants in

order to ensure that their claims for double penalty wages pursuant to 46 U.S.C. § 596 are not waived. Accordingly, defendants will pay to the representative of each decedent's estate the face value of Plaintiffs' Exhibits 17 through 20, i.e. John Hayes, $3,197.85; Troy Eaton, $1,691.15; Edwin Jones, $481.97; and Larry Reel, $314.29.

The evidence demonstrates that a substantial portion of each wage check tendered by defendants in July, 1975, represented a voluntary payment of vacation pay and contract bonus, items which defendants did not legally owe as of October 8, 1974. The Court therefore finds no basis for adjudging interest against defendants on the earned wage portion of each payment from date of casualty until the date judgment is executed.

### III. CONCLUSIONS OF LAW

■ 1. Jurisdiction of this Court to hear and determine the damage questions stemming from the four maritime deaths in the Gulf of Suez is proper pursuant to the Jones Act, 46 U.S.C. § 688, the Death on the High Seas Act, 46 U.S.C. §§ 761 *et seq.* (hereinafter "DOHSA") and the general maritime law. *Law v. Sea Drilling Corp.,* 510 F.2d 242, 250 (5th Cir.), *aff'd on rehearing,* 523 F.2d 793 (5th Cir. 1975). *But see Barbe v. Drummond,* 507 F.2d 794, 801 (1st Cir. 1974) (general maritime remedy not available in DOHSA actions); *McPherson v. Steamship South African Pioneer,* 321 F.Supp. 42, 47 (E.D.Va.1971). Defendants argue that general maritime remedies are not properly available for actions covered by DOHSA, a position in accord with the First Circuit but contrary to the Fifth Circuit's clear holding in *Law v. Sea Drilling Corp., supra.* This Court will apply the law as announced by the Fifth Circuit and recognize a recovery in this action which encompasses the nonpecuniary damage elements of the general maritime law, particularly loss of society. Defendants' contention that the Fifth Circuit erred in *Law v. Sea Drilling Corp., supra,* is more appropriately considered by that court.

2. At the trial the parties stipulated liability on the part of defendants so that all issues in contention concern the proper measure of damages.

### A. Recovery for Pain and Suffering of the Decedents Prior to Death

■ 3. Although DOHSA does not provide a recovery for conscious pain and suffering experienced by a decedent prior to death, such damages are available under the general maritime law and the Jones Act. *Roberson v. N.V. Stoomvaart Maatschappij,* 507 F.2d 994, 995 (5th Cir. 1975); *Barbe v. Drummond,* 507 F.2d 794 (1st Cir. 1974); *Dennis v. Central Gulf Steamship Corp.,* 453 F.2d 137, 140 (5th Cir.), *cert. denied,* 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218 (1972); *Greene v. Vantage Steamship Corp.,* 466 F.2d 159, 165–67 (4th Cir. 1972); *Petition of United States Steel Corp.,* 436 F.2d 1256, 1275 (6th Cir. 1970), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971).

In cases involving drowning, the courts generally have required evidence of a struggle or other post-accident consciousness on the part of the decedent before awarding damages for his pain and suffering prior to death. *See, e. g., Barton v. Brown (The Corsair),* 145 U.S. 335, 348, 12 S.Ct. 949, 36 L.Ed. 727 (1892); *Petition of United States Steel Corp., supra* at 1275–76; *Grantham v. Quinn Menhaden Fisheries, Inc.,* 344 F.2d 590 (4th Cir. 1965); *Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489, 495 (5th Cir. 1962); *Gardner v. National Bulk Carriers, Inc.,* 221 F.Supp. 243, 246 (E.D.Va.1963), *aff'd,* 333 F.2d 676 (4th Cir. 1964).

4. The fact that, as in the case at bar, an autopsy established the cause of a decedent's death as drowning has been held insufficient by the Fifth Circuit Court of Appeals to warrant an award for pain and suffering in the absence of proof that the decedent was conscious of his plight after he hit the water and that he unsuccessfully struggled to save his life. *Davis v. Parkhill-Goodloe Co., supra* at 495. As stated therein and of direct relevance to the instant showing by plaintiffs:

"Great ingenuity was exercised in putting forward a medical theory based upon expert testimony of the probable length of time it took for a person finally to expire in drowning. But there are so many unknowns in this unexplained slipping or falling of Davis into the water, that we should only say that substantial evidence will be required to sustain a finding of consciousness upon which to rest the permissible assumption of pain."

*Id.* (footnote deleted).

The cause of death as to three of the four decedents is unknown. They may have been killed instantly by the rig package which they were aboard as it slid off the barge and plummeted into the water 25 feet below, or they may have drowned. An autopsy indicates that Larry Reel died by drowning. However, regardless of the exact cause of death, there is no evidence indicating that Reel or the other three decedents consciously survived the impact of the fall into the water, *see* Findings of Fact 3 and 7, and the Court finds no basis for reasonably inferring such.

5. The cases cited by plaintiffs in support of an award for pain and suffering are inapposite because in each case there was evidence of the decedent's consciousness following the mishap and prior to his death. Additionally, *Soloman v. Warren,* 540 F.2d 777 (5th Cir. 1976), *petition for cert. filed sub nom., Warren v. Serody,* 45 U.S.L.W. 3815 (U. S., May 26, 1977) (No. 76–1673), is distinguishable because that case involved special application of the Florida Survival Statute to a plane crash at sea and the award of damages for the pain and suffering of those aboard from the time they most likely perceived their probable death until impact. Such is not the case here where impact was immediate.

Therefore, in light of the prevailing case authorities as applied to these facts, the Court concludes that plaintiffs have not proved by a preponderance of the evidence any entitlement for pain and suffering of the decedents.

### B. Pecuniary Loss to Survivors

6. A survivor may recover under DOHSA, the Jones Act and the general maritime law for the actual financial contributions the decedent would have made during his normal anticipated life span. *Sea-Land Services v. Gaudet,* 414 U.S. 573, at 584–85, 94 S.Ct. 806, 39 L.Ed.2d 9; *Davis v. Parkhill-Goodloe Co.,* 302 F.2d 489, 494 (5th Cir. 1962); *Petition of the United States,* 418 F.2d 264, 272 (1st Cir. 1969). The proper measure of damages for such loss of support is the reasonable pecuniary expectancy of each survivor over the remainder of the life expectancy of the decedent or the survivor, whichever is shorter. *The Complaint of Cambria Steamship Co.,* 505 F.2d 517 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975). In determining a reasonable expectancy,

"a guide is set by determining first how much money the decedent would have had available, and how much of that sum he would have contributed to his beneficiaries."

*In re Sincere Navigation Corp.,* 329 F.Supp. 652, 659 (E.D.La.1971).

7. In calculating the decedent's future earnings over his work-life expectancy, from which support contributions would have been made, any future inflationary effect on wages is not to be considered. *Davis v. Hill Eng'r, Inc.,* 549 F.2d 314, 332 (5th Cir. 1977), *citing Johnson v. Penrod Drilling Co.,* 510 F.2d 234 (5th Cir.) (en banc), *cert. denied,* 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975). Additionally, a survivor's future pecuniary loss must be discounted to present value for purposes of present payment by employing an appropriate interest rate prevailing at the time and place of trial. *Johnson v. Penrod Drilling Co., supra.*

8. The law also entitles spouse and child survivors to recover upon a proper showing for the loss of the prospective inheritance which might have been received if the decedent had not died prior to his anticipated life expectancy. *Soloman v. Warren, supra* at 790–92, *citing Martin v. Atlantic*

*Coast Line R.R. Co.,* 268 F.2d 397 (5th Cir. 1959); *National Airlines, Inc. v. Stiles,* 268 F.2d 400 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). Due to the age of the parent survivors of Larry Reel and Ed Jones and their normal life expectancies as compared to the anticipated life expectancies of their deceased sons, there can be no reasonable expectancy that they would have inherited upon his natural death any potential increase in their respective sons' estates, even assuming that they were designated at the time of their sons' deaths as legatees under validly-executed wills. *Petition of United States,* 303 F.Supp. 1282, 1306 (E.D.N.C.1969), *aff'd,* 432 F.2d 1357 (4th Cir. 1970); *Wasilko v. United States,* 300 F.Supp. 573, 601 (N.D. Ohio 1967), *aff'd,* 412 F.2d 859 (6th Cir. 1969).

■ The Court, taking into account all pertinent factors, must determine, first, whether the decedent, if he had lived his normal life expectancy, would have amassed an inheritable estate, and second, whether each survivor-claimant "would continue to be the natural object of his [the decedent's] affection and beneficence if he lived out his expectancy". *National Airlines, Inc. v. Stiles, supra* at 403.

9. Plaintiffs contend that "[t]he lost wages of the decedents claimed herein represent the measure of pecuniary loss sustained by these claimants," discounted for personal consumption and present value. Plaintiffs' Arguments and Authorities, October 14, 1976, at 3, 14–15. Plaintiffs thus ask this Court to presume that the total financial loss to each set of survivors, including the parents of Larry Reel and Ed Jones, for loss of support, contribution and prospective inheritance is equal to the anticipated gross income of each decedent less his personal consumption during the remainder of his work life expectancy.

■ If this Court adopted such a formula, it would in fact be awarding each set of survivors the economic value of the decedent's estate, rather than the value of *each plaintiff's* diminished pecuniary expectation. Because each survivor is suing on his

or her behalf and not on behalf of the estate, *see, e. g., Sea-Land Services v. Gaudet, supra; Hassan v. A. M. Landry & Son, Inc.,* 321 F.2d 570, 571 (5th Cir. 1963), *cert. denied,* 375 U.S. 967, 84 S.Ct. 486, 11 L.Ed.2d 416 (1964); *In re Southern Steamship Company's Petition,* 135 F.Supp. 358 (D.Del.1955), the survivors are not entitled under the law to recover the loss of economic value of each decedent's life, as such a measure seldom reflects the realistic expectations of the survivors, especially parents, and is unduly punitive. *The Complaint of Cambria Steamship Co.,* 505 F.2d 517, 522–23 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975) (general maritime law); *Middleton v. Luckenbach S.S. Co.,* 70 F.2d 326 (2d Cir. 1934), *cert. denied,* 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674 (1934) (DOHSA); *In re Farrell Lines, Inc.,* 339 F.Supp. 91, 95 (E.D.La.1971) (Jones Act and general maritime law); *Clinton v. Ingram Corp.,* 312 F.Supp. 539 (N.D.Miss.1970) (Jones Act). Rather, the proper focus is on the financial loss suffered by each survivor with reference to the decedent's history of earnings and contributions and anticipated future earning potential as a means of establishing a maximum monetary amount available for distribution as such financial losses are proved. As stated by the Fifth Circuit in the context of a Jones Act action:

"If the plaintiff as administratrix is entitled to recover under the Jones Act, her recovery would not be on behalf of the estate but solely as trustee for the designated survivors, that is, in this case the widow and minor children."

*Hassan v. A. M. Landry & Son, Inc., supra* at 571. Such is the status in which these representative plaintiffs sue.

■ 10. Children of a decedent are entitled to a recovery for the pecuniary loss of nurture, guidance and training occasioned by the death of their parent. *Soloman v. Warren, supra* at 788–90. As pointed out by the Fifth Circuit in *Soloman,* damages properly are awardable to each child for such loss until he or she reaches majority, although such loss necessarily diminishes in

value as the child approaches majority and leaves his parents' home for college or his separate home. *Soloman v. Warren, supra* at 788–90, *and cases cited therein.*

■ In determining the amount of loss suffered by the children, the Court should take into account evidence that the decedent periodically was absent from his home for employment purposes and that similar absences could be anticipated in the future. *See, e. g., Curry v. United States,* 338 F.Supp. 1219, 1224 (N.D.Cal.1971). The Court also should realistically appraise the decedent's contributions to his children's guidance, training and nurture up until his death, as established by the evidence. *See, e. g., Moore-McCormack Lines, Inc. v. Richardspn,* 295 F.2d 583, 588 (2d Cir. 1961), *cert. denied,* 370 U.S. 937, 82 S.Ct. 1577, 8 L.Ed.2d 806 (1962).

■ 11. Loss of a decedent's services is recoverable under DOHSA, the Jones Act and the general maritime law. *Sea-Land Services v. Gaudet, supra,* 414 U.S. at 584–85, 94 S.Ct. 806. A survivor may recover the monetary value of household services the decedent provided and would have continued to provide but for his wrongful death. In determining the appropriate quantum of damages for lost services, the Court should consider the nature of the relationship between a particular survivor and the decedent, and the decedent's anticipated presence at home in light of his age and the nature of his occupation. *See, e. g., Michigan Central R.R. Co. v. Vreeland,* 277 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913); *Curry v. United States, supra* at 1223–24.

### C. Nonpecuniary Loss to Survivors

■ 12. Although loss of a decedent's society is not a recognizable element of damages under either the Jones Act or DOHSA because it represents a nonpecuniary loss, *see Igneri v. Cie. de Transports Oceaniques,* 323 F.2d 257, 266 (2d Cir. 1963), *cert. denied,* 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964) (Jones Act); *First Nat'l Bank v. National Airlines, Inc.,* 288 F.2d 621, 624 (2d Cir. 1961), *cert. denied,* 368 U.S. 859, 82 S.Ct. 102, 7 L.Ed.2d 57 (1961) (DOH-

SA), it is recoverable under the general maritime law. *Sea-Land Services v. Gaudet,* 414 U.S. 573, 584–92, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). As defined by the Supreme Court in *Gaudet,*

> "[t]he term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection."

*Id.* at 585, 94 S.Ct. at 815 (footnote deleted).

A treatise relied upon heavily by the Supreme Court in *Gaudet* lists eight criteria which properly are considered in determining a right to and amount of recovery for loss of society:

(1) Relationship of husband and wife, or of parent and child . . .;

(2) Continuous living together of parties at and prior to time of wrongful death;

(3) Lack of absence of deceased or beneficiary for extended periods of time;

(4) Harmonious marital or family relationships;

(5) Common interest in hobbies, scholarship, art, religion, or social activities;

(6) Participation of deceased in family activities;

(7) Disposition and habit of deceased to tender aid, solace and comfort when required; and

(8) Ability and habit of deceased to render advice and assistance in financial matters, business activities and the like.

S. Speiser, Recovery for Wrongful Death 223 (1966). *See In re Farrell Lines, Inc.,* 378 F.Supp. 1354, 1358 n.5 (S.D.Ga.1974).

■ Defendants, focusing solely on terminology employed by the Supreme Court in *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), and *Sea-Land Services v. Gaudet, supra,* contend that financial dependency should be a prerequisite to recovery under the general maritime law for a nonpecuniary loss of society. Decisions in this circuit subsequent to *Moragne* and *Gaudet* have rejected

such a restrictive application of the general maritime remedy and have recognized the standing of children, spouses and parents of a decedent to recover for a loss of society. *See Skidmore v. Grueninger,* 506 F.2d 716, 729 n.11 (5th Cir. 1975) (adult daughter), *decision on remand,* (Memorandum Opinion on Remand, C.A. No. 70–1015, Section D) (E.D.La., December 10, 1975); *Herbert v. Otto Candies, Inc.,* 402 F.Supp. 503, 507 (E.D.La.1975) (spouse and children); *Hamilton v. Canal Barge Co.,* 395 F.Supp. 975, 985 (E.D.La.1975) (parents); *cf. The Complaint of Cambria Steamship Co.,* 505 F.2d 517, 524–25 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975). These courts properly have looked to the Jones Act, DOHSA and state wrongful death acts for guidance in defining those survivors who may invoke the general maritime law. Moreover, because a loss of society is not a financial loss, it would be inappropriate to conclusively presume that only those family members financially dependent on the decedent have suffered such loss. Accordingly, a financial dependency need not be shown by these immediate family members in order to recover for loss of society under the general maritime law.

■ The surviving spouse also may properly recover for a loss of consortium, which is encompassed within the broader "loss of society" damage category. *Skidmore v. Grueninger, supra* at 728.

■ 13. It is settled law that survivors suing under the Jones Act and DOHSA cannot recover damages for nonpecuniary losses such as mental anguish and grief. *Petition of M/V Elaine Jones,* 480 F.2d 11, 31 (5th Cir. 1973), *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1976); *Igneri v. Cie. de Transports Oceaniques,* 323 F.2d 257 (2d Cir. 1963), *cert. denied,* 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964). The Supreme Court in *Sea-Land Services v. Gaudet, supra,* 414 U.S. at 585 n.17, 94 S.Ct. 806, 39 L.Ed.2d 9, also has held that mental anguish, sorrow and grief are not compensable under the general maritime law, although a nonpecuniary loss of society is compensable.[1] *See McDonald v. Federal Barge Lines, Inc.,* 496 F.2d 1376 (5th Cir. 1974).

■ Additionally, the survivors of Larry Reel and Ed Jones may not rely directly on the Arkansas Wrongful Death Statute, Ark. Stat.Ann. § 27–909, as a basis for recovery for mental anguish, grief and sorrow because the Arkansas statute does not apply to injuries which occur outside the territorial boundaries of the State of Arkansas. *Crowder v. Gordons Transports, Inc.,* 387 F.2d 413, 415 (8th Cir. 1967); *Bell Transpor-*

---

1. The Court, adopting the analysis of Professor Speiser in his treatise on wrongful death, explained the reason for allowing a nonpecuniary recovery for loss of society (which includes "love, affection, care, attention, companionship, comfort, and protection", 414 U.S. at 585, 94 S.Ct. at 815, and disallowing a nonpecuniary recovery for grief and sorrow as follows:

"The former [loss of society] entails the loss of positive benefits, while the latter represents an emotional response to the wrongful death. . . . 'When we speak of recovery for the beneficiaries' mental anguish, we are primarily concerned, not with the benefits they have lost, but with the issue of compensating them for their harrowing experience resulting from the death of a loved one. This requires a somewhat negative approach. . . In other areas of damage, we focus on more positive aspects of the injury such as what would the decedent, had he lived, have contributed in terms of support, assistance, training, comfort, consortium, etc. . . .'"

414 U.S. at 585 n.17, 94 S.Ct. at 815. The above-quoted language is important in that the Fifth Circuit Court of Appeals, in its *pre-Gaudet* opinion in *Petition of M/V Elaine Jones,* 480 F.2d 11 (5th Cir. 1973), *cert. denied,* 423 U.S. 840, 96 S.Ct. 71, 46 L.Ed.2d 60 (1976), grouped loss of society with mental anguish into a general nonpecuniary category labelled "survivor's grief" for which recovery was denied. 480 F.2d at 29–34; *see e. g., Hueschen v. Fluor Ocean Services, Inc.,* 483 F.2d 1396 (5th Cir. 1973), opinion withdrawn following settlement, 494 F.2d 1354 (1974). Because this grouping was overbroad in light of the subsequent *Gaudet* decision, and because the Supreme Court has recognized a recovery for loss of society, the lengthy analysis and conclusions in *Petition of M/V Elaine Jones, supra,* are of little precedential value today. *See Landry v. Two R. Drilling Co.,* 511 F.2d 138, 140–41 (5th Cir. 1975); *McDonald v. Federal Barge Lines, Inc.,* 496 F.2d 1376 (5th Cir. 1974).

*tation Co. v. Morehead,* 246 Ark. 170, 437 S.W.2d 234 (Ark.1969). Plaintiffs contend, however, that the damage items incorporated in the Arkansas statute should be applied in this case so as to "supplement" the general maritime law. In so arguing, plaintiffs seek to do indirectly what they cannot do directly, that is, utilize the substance of the Arkansas statute.

■ In *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), the Supreme Court fashioned a new federal cause of action for wrongful death to replace the prior reliance on non-uniform state wrongful death statutes. The Court declared that, in defining the contours of this new remedy, state laws should be consulted with a view toward discerning general principles and trends that might properly be encompassed within the scope of the new federal action. However, the general maritime cause of action for wrongful death is not dependent on adjacent state law, *Hornsby v. Fish Meal Co.,* 431 F.2d 865 (5th Cir. 1970), and if "elements of recovery [are] borrowed from state death acts [they] must be consonant with federal maritime policies." *Petition of M/V Elaine Jones, supra* at 31 n.15; *see Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

■ In *Gaudet,* the Supreme Court clearly enunciated not only the elements of damages recoverable in a *Moragne*-type action, but also explained why damages for grief and mental anguish should not be allowed. *See* note 1, *supra.* Therefore, because the Supreme Court has rejected a recovery for grief, this Court cannot and will not rely on a state statute that runs counter to the prohibition announced in *Gaudet. See In re Farrell Lines,* 378 F.Supp. 1354, 1360–61 (S.D.Ga.1974).

### D. Penalty Wages Pursuant to 46 U.S.C. § 596

14. Plaintiffs seek penalty wages as provided by 46 U.S.C. § 596. The statute provides:

"The master or owner of any vessel making coasting voyages shall pay to every seaman his wages within two days after the termination of the agreement under which he was shipped, or at the time such seaman is discharged, whichever first happens; and in case of vessels making foreign voyages, or from a port on the Atlantic to a port on the Pacific, or vice versa, within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court; but this section shall not apply to masters or owners of any vessel the seamen of which are entitled to share in the profits of the cruise or voyage. This section shall not apply to fishing or whaling vessels or yachts."

At the time the four decedents were killed, they had accrued earned wages during the existing pay period. The decedents did not possess any causes of action under Section 596 for wages payable yet wrongfully withheld by the defendants.

15. Plaintiffs argue that in view of the defendants' failure to pay to them within the statutory time period the wages accrued by the decedents, they are entitled to invoke Section 596. Thus, they seek an additional two days pay for every day the wages plus penalties have remained outstanding, including the time which has elapsed during this judicial proceeding which commenced two months following the tragedy. Contending that the accrued wage payments by defendants in July, 1975, did not stop the running of the statutory time period, *see* Finding of Fact 37, *supra,* plaintiffs compute their entitlement as follows up until the time of trial:

| Decedent | Daily Wage | Accrued Wages, Less Expenses, at Death | Penalty Wages |
|----------|-----------|----------------------------------------|---------------|
| John Hayes | $160.00 | $3,197.85 | $116,800.00 |
| Troy Eaton | 140.00 | 1,691.15 | 102,200.00 |
| Edwin Jones | 83.32 | 481.97 | 60,833.33 |
| Larry Reel | 83.32 | 314.29 | 60,833.33 |

16. Plaintiffs' claim for penalty wages pursuant to Section 596 in the special context of a death action is apparently novel. Neither counsel nor this Court has located any case authorities which discuss the standing of the survivors of a deceased seaman to invoke the Section 596 penalty wage provision when they are not paid the decedent's accrued wages immediately following his death. In light of another section within Title 46 entitled *"Effects of Deceased Seamen"* which deals specifically with the accrued wage problem that arises when a seaman dies at sea, *see* 46 U.S.C. §§ 621–28, the Court finds no merit to plaintiffs' argument that they are entitled to a recovery pursuant to Section 596.

17. Defendants have briefed at length their contention that these decedents were not "seamen" on a "voyage" as those terms are used in the wage protection statutes contained in Title 46, including Sections 596 and 621–628. Given the nineteenth century derivation of these statutes, the Court acknowledges difficulties in technically applying these statutes to a modern maritime setting such as an offshore drilling rig. However, the Court need not address itself to the appropriate scope of these terms as used in these special wage statutes. Even assuming that the decedents were "seamen" on a "voyage," and therefore were within the scope of these provisions, the Court nevertheless concludes that penalty wages pursuant to Section 596 clearly are not recoverable by these plaintiffs.

18. The United States Supreme Court recently has stated that

"[t]he obvious concern of § 596 is that the shipowner not unlawfully withhold wages, and thereby unjustly enrich himself while wrongfully denying the seaman the benefits of his labor."

*American Foreign S.S. Co. v. Matise*, 423 U.S. 150, 159, 96 S.Ct. 410, 416, 46 L.Ed.2d 354 (1975). Other courts have more specifically noted that

"the apparent rationale of § 596 [is] that sea[men] not be stranded in foreign ports or domestic ports remote from where they were employed without payment of a significant portion of the amounts due them, so as to obviate their being without funds or under economic compulsion to sign new articles on terms and conditions dictated by the master or owner."

*Eaton v. SS Export Challenger*, 376 F.2d 725, 727–28 (4th Cir. 1967); *accord, Ladzinski v. Sperling Steamship and Trading Corp.*, 300 F.Supp. 947, 954 (S.D.N.Y.1969); *Malanos v. Chandris*, 181 F.Supp. 189, 191 (N.D.N.Y.1959).

19. Sections 621 thru 628 of Title 46, grouped under the heading *"Effects of Deceased Seamen,"* set forth a procedure to be followed in disposing of a deceased seaman's accrued earnings if he dies while at sea. Section 623, entitled *"Penalty for neglect of master,"* further provides for a treble damage remedy which may be assessed if the master or owner of the vessel does not duly pay such wages.

In substance, these sections provide for an interpleader-like procedure whereby unpaid wages are deposited in the federal district court where the deceased seaman resided. Persons claiming an entitlement to the fund thereafter may come forward and assert their respective claims. The district court then shall award the fund to those claimants deemed by the court to be lawfully entitled to it. Through such a device, the burden of determining entitlement to the fund is placed on the court, thus protecting both the owner of the vessel and the rightful claimants from a misguided payment to a person not lawfully entitled thereto.

20. No judicial authorities have been cited by counsel or located by this Court which discuss the interplay between Section 596 and Sections 621–28. It is clear, however, from an examination of the statutory language contained in these provisions that Sections 621 *et seq.* govern

claims by the estates of deceased seamen for wages accrued prior to death. To hold otherwise and make owners of vessels susceptible to penalty wage liability under Section 596 if they do not pay such wages to the seaman's survivors within two days of death would wholly negate the obvious intent of Congress in enacting Sections 621 *et seq.*, which was to set up a *judicial* procedure to be followed in distributing the earned wages of a deceased seaman. *See In re Holmberg's Estate*, 193 F. 260, 262 (N.D.Cal.1912). Thus, the Court concludes that the sections covering "Effects of Deceased Seamen" set forth the exclusive statutory remedy available to a deceased seaman's estate and survivors to recover wages earned but not wrongfully withheld at the time of death. As stated in *In re Buckley*, 33 F.2d 615, 616 (D.Mass.1929):

> "There can be no doubt as to the power of Congress to provide for the disposition of the wages and effects of seamen who die in service. It has undertaken to do so by statutes which provide a complete scheme of disposition."

21. Plaintiffs contend that the United States Supreme Court in *American Foreign S.S. Co. v. Matise*, 423 U.S. 150, 155 n.9, 96 S.Ct. 410, 46 L.Ed.2d 354 (1975) recognized that an action under Section 596 survives a deceased seaman and can be prosecuted by his legal representative. In *Matise*, the Supreme Court allowed the plaintiff-seaman's representative to be substituted for the seaman where the seaman died during the course of the legal proceeding previously filed by him pursuant to 46 U.S.C. § 596. This situation is factually distinct from the instant case wherein the decedents' survivors have instituted independent claims for penalty wages pursuant to 46 U.S.C. § 596 which the decedents did not possess at the time of their demise. Thus, the *Matise* case has no bearing on the question of whether or not Section 596 can be invoked directly by these plaintiffs.

22. Although not urged by plaintiffs, the Court concludes that the statutory purpose behind Sections 621 *et seq.* has been satisfied in the instant case. The instant action was filed on December 12, 1974, two months following the tragedy. Thereafter, defendants prepared drafts payable to the legal representatives of the four estates covering the accrued unpaid earnings of the decedents plus bonuses not technically accrued at the time of death. Plaintiffs, in lieu of negotiating the wage checks, held them so as to preserve a claim for penalty wages, which was thereafter urged in Plaintiffs' Third Amended Complaint. The Court now is in a position to make a distribution in accordance with 46 U.S.C. § 627.

■ Technically, the defendants have not complied with the procedures contemplated by Sections 622 and 627 in that they did not pay the decedents' accrued wages to a Coast Guard official who in return would deliver them to the district court for later distribution. Nevertheless, in conjunction with other relief requested by plaintiffs, this district court now can make the appropriate distribution of unpaid wages to the decedents' respective estates. Moreover, the time lag between the date of the casualty and the later proffer of payment by defendants is not out of line with other reported decisions under these sections. *See, e. g., In re Ginther*, 189 F.Supp. 872 (D.Md.1960) (nine months between seaman's death and payment of wages into court). Accordingly, plaintiffs' request for penalty wages pursuant to Section 596 will be denied.

■ 23. In the alternative, the Court would note that owners of vessels are not liable for penalty wages under 46 U.S.C. § 596 if "sufficient cause" exists for nonpayment. "Sufficient cause" has been interpreted to include instances where the applicability of Section 596 to a given set of facts is unclear and there is no bad faith in withholding of wages. *See The Velma L. Hamlin*, 40 F.2d 852 (4th Cir. 1930), *and cases cited therein; Bassis v. Universal Line, S.A.*, 322 F.Supp. 449, 459 (E.D.N.Y. 1970). Given the novelty of plaintiffs' claim in a death action context, "sufficient cause" for withholding wages clearly should exist in this case.

## IV.  CONCLUSION

24.  Counsel for plaintiffs stated at trial that plaintiffs no longer seek a recovery of punitive damages.  Therefore, this requested element of damages is denied as moot.

25.  By reason of the foregoing findings of fact and conclusions of law, plaintiffs are entitled to judgment against the defendants as follows:

(A) For the death of John Hayes:
| | |
|---|---|
| (1) Unpaid Wages | $  3,197.85 |
| (2) Evelyn Rhonda Thompson· | 30,000.00 |
| (3) Mark Hayes | 42,000.00 |
| TOTAL | $ 75,197.85 |

(B) For the death of Troy Eaton:
| | |
|---|---|
| (1) Unpaid Wages | $  1,691.15 |
| (2) Louzelle Hawkins Eaton | 175,000.00 |
| (3) Johnnie June Eaton Bell | 17,000.00 |
| (4) Ricky Eaton | 19,000.00 |
| (5) Drinda Eaton | 26,000.00 |
| (6) Mandie Eaton | 35,000.00 |
| TOTAL | $273,691.15 |

(C) For the death of Edwin Jones:
| | |
|---|---|
| (1) Unpaid Wages | $    481.97 |
| (2) Mr. & Mrs. Jones | 35,000.00 |
| TOTAL | $ 35,481.97 |

(D) For the death of Larry Reel:
| | |
|---|---|
| (1) Unpaid Wages | $    314.29 |
| (2) Mr. & Mrs. Reel | 35,000.00 |
| TOTAL | $ 35,314.29 |

26.  To the extent that any of the foregoing findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

Counsel for the plaintiffs will submit an appropriate judgment within twenty (20) days incorporating by reference these findings of fact and conclusions of law.  Legal interest will run from the date of judgment, the Court having determined from a full review of the record that there is no factual or legal basis to hold otherwise.