In re AIR CRASH DISASTER NEAR BOMBAY, INDIA ON JANUARY 1, 1978.

MDL No. 359.

United States District Court, W. D. Washington.

Feb. 20, 1982.

Clinton H. Coddington, Coddington & Winters, Menlo Park, Cal., F. Lee Campbell, Karr, Tuttle, Koch, Campbell, Mawer & Morrow, Seattle, Wash., for Lear Siegler.

Keith Gerrard, Steven C. Marshall, Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., for Boeing.

Lalita H. Shenoy, Waterman & Shenoy, Santa Rosa, Cal., Lee S. Kreindler, Kreindler & Kreindler, New York City, Richard E. Crow, Crow, Lytle, Gilwee, Donoghue, Adler & Weninger, Sacramento, Cal., for passenger plaintiffs.

Bruce Walkup, Walkup, Downing, Shelby, Bastian, Melodia, Kelly & O'Reilly, San Francisco, Cal., for cabin crew plaintiffs.

Lembhard G. Howell, Seattle, Wash., for cockpit crew plaintiffs.

Arthur Sherman, Beverly Hills, Cal., for Khan plaintiffs.

Roy J. Moceri, John D. Wilson, Jr., Reed, McClure, Moceri & Thonn, Seattle, Wash., for Rockwell Intern.

## OPINION

FITZGERALD, District Judge.

On New Year's Day 1978, an Air India Boeing 747 aircraft crashed into the sea shortly after takeoff from Santa Cruz Airport, Bombay, India. All persons aboard, nearly all of whom were Indian Nationals, were killed. After claims against Air India had been settled, the personal representatives of the deceased brought their claims to several United States district courts alleging that the accident was caused by a malfunction in certain components of the aircraft.[1] Plaintiffs contend the United States district courts provide the only proper forum for their claims since the defendants are United States corporations and proof of defendants' liability is to be found among documents and witnesses under defendants' control in the United States. Defendants have taken a contrary position claiming the loss of the aircraft and all persons aboard occurred as a result of faulty operational control of the aircraft and was the responsibility of the pilot and crew. The evidence relied upon to support defendants' position is therefore all in India. Presently before the court are two motions, one to dismiss on the basis of *forum non conveniens* and the other asking for an order settling choice of law issues and the applicability to this case of the Death on the High Seas Act, 46 U.S.C. §§ 761–68. With respect to the *forum non conveniens* motion all defendants have agreed: (1) to submit to the jurisdiction of the courts of India; (2) to make their employees available to testify in India; and (3) to waive any applicable Indian statute of limitations.

## A. FORUM NON CONVENIENS

The controlling federal decision on *forum non conveniens* is *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). "The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when

jurisdiction is authorized by the letter of a general venue statute." *Id.* at 507, 67 S.Ct. at 842. The Court observed that the applicability of the *forum non conveniens* doctrine lies within the sound discretion of the trial court and rests upon consideration of various factors:

If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. Important considerations are the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. There may also be questions as to the enforcibility of a judgment if one is obtained. The court will weigh relative advantages and obstacles to fair trial. It is often said that the plaintiff may not, by choice of an inconvenient forum, "vex," "harass," or "oppress" the defendant by inflicting upon him expense or trouble not necessary to his own right to pursue his remedy. But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.

*Id.* at 508, 67 S.Ct. at 843. In addition, the Court identified a number of policy considerations which necessarily ought to be taken into account:

Administrative difficulties follow for courts when litigation is piled up in congested centers instead of being handled at its origin. Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation. In cases which touch affairs of many persons, there is reason for holding the trial in their view and reach rather than in remote parts of the country where they can learn of it by report

[1.] The cases have been designated MDL 359 by the Panel on Multidistrict Litigation.

only. There is a local interest in having localized controversies decided at home. There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

*Id.* at 508–09, 67 S.Ct.· at 843.

Defendants' theory is that the accident was caused by the pilot's disorientation in combination with his longstanding medical problems, including alcoholism, diabetes, gross tremors and fasting to lose weight. The proof, defendants argue, will depend upon demonstrative, documentary and testimonial evidence to be found in India, including *inter alia*: (1) the wreckage of the aircraft; (2) the cockpit voice recorder and the flight data recorder; (3) the aircraft's maintenance, operational, and flight records; (4) the crew's training and qualification records; (5) the investigative report of the Indian government; (6) Indian government investigators; (7) eyewitnesses to the accident and persons familiar with the crash site; (8) Air India employees, including maintenance and service personnel; (9) the pilot's medical records; (10) witnesses to the pilot's medical condition; (11) witnesses to the crew's activities the night before the crash; (12) air traffic control and airport personnel; and (13) persons familiar with weather conditions. Moreover, defendants assert that virtually all potential witnesses on damages are to be found in India and that proper resolution of damages would require this court to become familiar with Indian social, cultural and economic values differing substantially from our own.

Because the location of this evidence is in India, defendants doubt their ability to offer an adequate defense at a trial in the United States. They maintain that Air India and responsible agencies of the government of India have consistently thwarted defendants' attempts to obtain documentary and tangible evidence necessary to the defense of these actions. Defendants assert that 1) most of the witnesses in India would be unwilling witnesses whose attendance in a United States court cannot be compelled; and 2) as to those witnesses willing to testify in the United States, the cost of obtaining their attendance would be prohibitive. Consequently, defendants believe they would be forced to present their evidence at trial primarily through the use of depositions. They point out that in *Gulf Oil* the Supreme Court recognized the need for live testimony at trial:

[T]o fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants.

330 U.S. at 511, 67 S.Ct. at 844.

Defendants argue that plaintiffs' access to important sources of proof would not be similarly limited by a trial in India, because 1) plaintiffs will rely primarily on the testimony of experts, whose convenience is not an important factor for consideration; and 2) defendants have offered to make witnesses and documents under their control available to plaintiffs for trial in India. Moreover, defendants suggest that a view of the crash site by the trier of fact, under conditions similar to those existing at the time of the crash, is essential to an understanding of the defendants' theory of spatial disorientation. If these actions are tried in the United States, a view will, of course, not be available.

Finally, defendants suggest that India has the only true interest in this litigation. India, as the domicile of almost all of the decedents and beneficiaries, has a compelling interest in ensuring fair compensation to the victims of this tragedy. India has a legitimate interest in the safety of India's air transportation and the integrity and operational efficiency of Air India, a governmental entity.

There is merit in defendants' arguments. Evidence relating to operational control and maintenance of the aircraft is located in India. Serious problems have been encountered in efforts to obtain evidence from Indian government agencies regarding the official investigation into the crash and the

**1178**

preparation of the official government report concerning the accident. With some difficulty arrangements were made for Messrs. Singh and Chellappa, representatives of the Indian Air Ministry, to come to the United States bringing exhibits annexed to the government report[2] of the official inquiry conducted in India. Part of these arrangements required defendants to forgo any claims they might have asserted against Air India. The bulk of exhibits were not forthcoming and the few exhibits that were produced were subject to burdensome restrictions. The attorneys then travelled to India where additional delays and disputes hindered discovery efforts to obtain documents and other evidence. Following the initial attempt at discovery in India, a special master was appointed by agreement of the parties to oversee discovery. The special master and the attorneys, now armed with letters rogatory, again proceeded to India hoping to obtain the assistance of the court of India to aid in the production of documents and other exhibits. It now appears that much of the evidence sought by defendants is within the control of Indian governmental agencies and defendants continue to claim their efforts at discovery have been frustrated. For example, they claim to have been unable to obtain discovery regarding alcoholism of the pilot, the pilot's medical history, and the maintenance records of the instruments aboard the aircraft.

Obviously, production of evidence in India or testimony of Indian witnesses cannot be compelled by United States district courts. Faced with similar situations, other courts have not hesitated to dismiss cases on *forum non conveniens* grounds. *See e.g., Dahl v. United Technologies Corp.*, 472 F.Supp. 696 (D.Del.1979), *aff'd* 632 F.2d 1027 (3rd Cir. 1980); *Grodinsky v. Fairchild Industries, Inc.*, 507 F.Supp. 1245 (D.Md.

1981). Given the evidentiary problems inherent in trying this case in the United States, the discovery problems already encountered, and the fact that the accident occurred in India and involves foreign plaintiffs, I believe that this case should be tried in the courts of India if at all possible.

At common law the existence of an alternative forum may not have been a requirement under the doctrine of *forum non conveniens*. *See* Korbel, *The Law of Federal Venue and Choice of the Most Convenient Forum*, 15 Rutgers L.Rev. 607, 611 (1961); *see also* Blair, *The Doctrine of Forum Non Conveniens in Anglo-American Law*, 29 Colum.L.Rev. 1 (1929). However, in *Gulf Oil* the Supreme Court made it clear that "[i]n all cases in which the doctrine of *forum non conveniens* comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them." 330 U.S. at 506–07, 67 S.Ct. at 842. "As a prerequisite [to a *forum non conveniens* dismissal] the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case." *Pain v. United Technologies Corp.*, 637 F.2d 775, 784 (D.C.Cir.1980).[3] If there could have been any doubt as to whether an existence of a viable alternative forum is a prerequisite to a *forum non conveniens* dismissal, such was put to rest in *Piper Aircraft Co. v. Reyno,* —— U.S. ——, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). There the Supreme Court in discussing *Gilbert* and its companion case *Koster v. Lumberman's Mut. Cas. Co.*, 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), noted that the plaintiff's choice of forum should rarely be disturbed:

> However, when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would "establish ... oppressiveness and vexation to a de-

**2.** Referred to as the Chandurkar report.

**3.** Cf. *Piper Aircraft Co. v. Reyno,* —— U.S. ——, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 n.22 (1981).

At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the

defendant is "amenable to process" in the other jurisdiction. *Gilbert, supra,* [330 U.S.] at 506–507 [67 S.Ct. at 842]. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied.

fendant out of all proportion to plaintiff's convenience," or when the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems," the court may, in the exercise of its sound discretion, dismiss the case.

—— U.S. at ——, 102 S.Ct. at 258.

Since there was indeed an adequate alternative forum in *Piper Aircraft* and defendants had agreed to submit to the jurisdiction of the Scottish courts and to waive any statute of limitations defense that might be available, the Supreme Court held that a *forum non conveniens* dismissal was appropriate. The question now arises whether the courts of India constitute an alternative forum for this litigation.

Plaintiffs maintain that no alternative forum for this litigation exists in the courts of India because their claims are irrevocably time-barred.[4] Defendants, on the other hand, contend the statute of limitations in India has been tolled by the filing of the complaints in the United States; should the statute not have been tolled, defendants agree to submit voluntarily to the jurisdiction of the courts of India and waive their defense under the statute. If the actions are dismissed in the United States district courts, defendants say the courts of India are likely to accept jurisdiction.

The applicable Indian statute is found in the Limitation Act of 1963. The tolling provision relating to other actions pending is found in section 14(1) of the Act:

(1) In computing the period of limitation for any suit the time during which the plaintiff has been prosecuting with due diligence another civil proceeding, whether in a court of first instance or of appeal or of revision, against the defendant shall be excluded, where the proceeding relates to the same matter in issue and is prosecuted in good faith in a court which, from defect of jurisdiction or oth-

er cause of a like nature, is unable to entertain it.

The proper interpretation to be given section 14(1) is seriously contested by the parties. At issue is whether an American court would be considered by the courts of India to be a "court" within the meaning of the Act. Resolution of this question requires some understanding of the historical development of the judicial system in India.

Prior to the advent of British power in India, administration of justice in Northern India was in the hands of courts established by the Moghul emperors or other rulers and chieftains owing allegiance to them. These courts exercised both civil and criminal jurisdiction. After the Battles of Plassey in 1757 and Buxar in 1764, the British acquired the right to collect revenue in the Kingdoms of Bengal, Bihar and Orissa, and the British East India Company undertook this responsibility. Increased territorial responsibility in turn led to the establishment of judicial systems for the rural territory comprised of civil courts, termed mofussil dewanny adalats, and criminal courts, termed foujdary adalats. These courts were administered by the East India Company. Appeals from the mofussil or rural courts could be taken to courts located in Calcutta, Bombay and Madras.

Pursuant to the Regulating Act of 1733, Supreme Courts of Judicature were also established in Bengal, Bombay and Madras. These courts, known as the King's Courts as opposed to the Company Courts operating in the mofussil area, were intended to exercise jurisdiction in the presidency towns in which they were located. Jurisdictional disputes between the King's Courts and Company Courts were resolved by the passage of the Act of Settlement, 1781.

The Indian High Courts Act of 1862 authorized the British Parliament to create high courts in Bengal, Bombay and Madras to replace the King's Courts and Company Courts. With the establishment of these

---

**4.** With the exception of one affidavit, the evidence is uniform that the period of limitation in suits under the Indian Fatal Accident Act of 1855 is two years. That affidavit, submitted by Justice Beg on behalf of Lear Siegler, avers that the period of limitation is three years. At the hearing on the motion held August 13, 1981 both Krishan Nehra, expert for the plaintiffs and Ved Nanda, expert for the defendants, agreed the period of limitation was two years. Even if the period is three years, the period would have run.

three high courts, all the courts in British India became "crown courts" and were brought, for the first time, under one unified system of control. Meanwhile, consolidation of British power in India continued. By the middle of the nineteenth century, the British East India Company had assumed direct control over three-fifths of India and the remaining areas were held by more than five hundred princely states subject to British control and intervention. Various civil courts were established in the provinces subject to British control.

The case law reflects the attitude of the Indian courts, over which British judges often presided, that the courts of British India were superior to those of the princely states which were not considered worthy of the appellation "court." Thus, these judges tended to rule that prior proceedings before the princely courts were not judicial proceedings and to limit, as a matter of statutory construction, the term "court" in the tolling provision to proceedings before Indian courts. *Bhalchand v. Doshi*, A.I.R. (1934) Bombay 113(2); *Chanmalapa Chenbasapa Tenginkai v. Abdul Vahab*, (1910) Indian L.R., 35 Bombay 139; *Pattabhiramayya v. Narayana Rao*, A.I.R. (1960) Andhra Pradesh 625; *Roshanlal v. R. B. Mohan Singh*, A.I.R. (1975) Supreme Court 824. Thus, in *Chanmalapa* the court held:

> ... we are of the opinion that the word "Court" in section 14 of the Limitation Act does not include a foreign Court. (1910) Indian L.R.

The Commentators also agree with this view:

> "Foreign Court."—The term "Court" has not been defined in this Act; but it must mean either a Court having authority in India or established by the Government of India in any place out of *India*. It does not therefore include a foreign Court. This section cannot therefore apply to prior proceedings in foreign Courts.

Venkataraman, *Mitra's Law of Limitation and Prescription*, (8th ed. 1966) at 238.

Foreign Courts. The section does not apply to prior proceedings in foreign Courts and time spent in such proceedings cannot be excluded under this section.... The word "Court" in section 14 does not include a *foreign* Court.

Chitaley and Bikhale, *The Limitation Act of 1963*, All India Reporter Ltd. (5th ed. 1976) at 432, 447.

Only one decision can be found to the contrary. *See Firm Ramnath v. Firm Bragatham & Co.*, A.I.R. (1959) Rajasthan 149; *see also* A.I.R. (1960) Rajasthan 219. Defendants' expert witness, Professor Nanda, stated his opinion that all cases relied upon by plaintiff were based strictly on the historical relationship between Indian courts and the princely courts. He stated that the Limitation Act is to be construed liberally and further expressed his belief that the *Ramnath* opinion was the most carefully reasoned treatment of the subject and represents a modern view that would be applied by the Indian courts today.

However, the reasoning of the *Ramnath* court was closely examined and rejected in *Pattabhiramayya v. Narayana Rao*, A.I.R. (1960) Andhra Pradesh 625. That court concluded that the term "court", as used in the tolling section of the Limitation Act, does not extend to foreign courts. Perhaps more importantly, if the claims arising out of the Air India crash of New Year's Day 1978 were to be tried in India, venue would be in the High Court of Bombay.[5] The Bombay High Court has clearly held that the tolling statute does not encompass proceedings before foreign courts. *Balchand*, A.I.R. (1934) at 114.

■ I conclude that the filing of the actions in United States Courts would not toll the Limitation Act of 1963 under Section 14(1).

Defendants, however, have offered to waive any limitation defense under the statute and the question then arises whether this action may be effective. Section 3(1) of the Limitation Act provides:

**5.** Under Indian law a case such as this could only be filed where the wrong was done or where the defendant resides or carries on business. Defendants' expert at the August 13,

1981 hearing conceded that should this action be tried in India it would have to be tried in Bombay. *See* Reporters' transcript at 179.

Subject to the provisions contained in sections 4 to 24 (inclusive), every suit instituted, appeal preferred, and application made after the prescribed period shall be dismissed, although limitation has not been set up as a defence.

According to an authoritative commentary on the law of India:

> The Court is bound under this section to dismiss a suit or other proceeding which has been instituted after the period of limitation although limitation has not been set up as a defence. Hence, it is not competent to a party to *waive* a plea of limitation so as to absolve the Court from this duty.... Even if such plea is waived, the party or the Court itself can take it up again.

Chitaley and Bikhale, *supra*, at 147. The relevant decisions are in accord, *see Sitarama Chetty v. Cotta Krishnasami Chetty*, XXI Indian Cases, (1913) Madras 24; *Khetra Mohan Catterjee v. Mohim Chandra Das*, XVIII Indian Cases (1913) Calcutta 595, as is the testimony of plaintiffs' expert witness, Krishan Nehra.

A.  Which means if it is provided under Indian Fatal Accident Act, the limit is two years and if two years have expired, then another party cannot come forward and say that I consent to the case being filed even after the statute of limitation has run and I will not take an objection to the statute of limitation. Such a plea the court cannot entertain.

Q.  Is that principle that you've just enunciated contained in a particular section of the Indian law; the Indian Limitation Act?

A.  Yes, Section 3 (pause).[6]

Defendants suggest that rather than deciding questions of Indian Law now, I should condition any dismissal of these actions upon the availability in India of an alternative forum. In that way, so the argument goes, the plaintiffs would be protected because this court could promptly reassert its jurisdiction should the courts in India find the action barred by the Limitation Act. This approach has been followed by a number of courts where a *forum non conveniens* dismissal has been conditionally granted upon the availability of an alternative forum. *See e.g., Scherteinleib v. Traum*, 589 F.2d 1156, 1163 (2d Cir. 1978); *Grodinsky v. Fairchild Indus. Inc.*, 507 F.Supp. 1245, 1251 (D.Md.1981). This might constitute a viable alternative if prompt resolution of the jurisdictional question were assured. Professor Nanda, defendants' expert, however, could provide no assurances that Indian courts would promptly decide the issue although he suggested that Indian courts could give the case priority. Mr. Nehra, plaintiffs' expert, estimated the issue might take ten years to resolve.

I conclude that an early decision in the courts of India would be improbable. In this connection I note the *Ramnath* case was first initiated in 1944 and was not reported until 1959.[7]

Moreover, I believe it most improbable that the courts of India would entertain the plaintiffs' claims in view of the almost complete unanimity of decisions on the tolling provision.

In *Scherteinleib*, the Second Circuit indicated "that a district court should not dismiss [on *forum non conveniens* grounds] unless it justifiably believes that the alternative forum will take jurisdiction, if the defendant consents." 589 F.2d at 1163.

I conclude that defendants have failed to meet their burden of proof[8] and

**6.** Reporters' transcript of hearing of August 13, 1981 at 107–111.

**7.** In so holding, I take judicial note of the extensive delays that are a routine part of the Indian Judicial System. *See* Los Angeles Times, July 24, 1981, at 21, Col. 1.

**8.** The standard to be applied is whether, in light of these factors, defendants have made

a "clear showing" that either: "(1) establish such oppression and vexation of a defendant as to be out of proportion to the plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems."
*Miskow v. Boeing Co.*, 664 F.2d 205, 208 (9th Cir. 1981).

further conclude that there is at this time no alternative forum in which to try the claims.[9]

I recognize that trial of this case in a United States district court presents substantial difficulty having to do with the production of evidence and the ability to compel the testimony of witnesses. Defendants have expressed their concern that because a United States court is powerless to compel discovery or testimony of witnesses located in India, trial of this lawsuit will deprive them of an adequate opportunity to present their defense. Conceivably, as defendants have on occasion suggested, discovery in India could be so limited that defendants might be denied due process of law by trial of this matter in the United States. That issue, however, is not now before me, nor can a determination be made at this stage of this litigation. Efforts to obtain discovery must continue and all reasonable efforts exhausted before consideration may be given to defendants' due process claims.

## B. JURISDICTION AND CHOICE OF LAW

In June of 1979 the attorneys for the personal representatives of the deceased passengers filed a master amended complaint asserting jurisdiction under the Death on the High Seas Act, 46 U.S.C. §§ 761–68, and the general maritime law, 28 U.S.C. § 1333. Under either jurisdictional basis, plaintiffs maintain that American law, and in particular the American rule of strict liability in tort, should govern the resolution of this litigation.

Defendants, on the other hand, argue that this court does not have subject matter jurisdiction in admiralty under either the Death on the High Seas Act or the general maritime law. Assuming *arguendo* that admiralty jurisdiction exists, however, defendants contend that the law of India, and not American law, should govern the resolution of these cases.[10]

Section 1 of the Death on the High Seas Act, 46 U.S.C. § 761, provides a remedy for wrongful deaths "occurring on the high seas beyond a marine league [three nautical miles] from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States." Obviously, the plane crash at issue in this litigation occurred beyond a marine league from the shores of the United States, and it is likewise undisputed that the crash occurred in navigable waters of the Arabian Sea within the twelve nautical miles claimed as territorial waters by India under the 1976 Territorial Waters Act of India.

The parties dispute, however, the precise location of the crash resulting in the deaths of plaintiffs' decedents. Plaintiffs contend that the crash occurred more than three nautical miles back of a marine league from the shores of India, while defendants contend that the crash occurred within three nautical miles of shore. I find that for the purpose of finding jurisdiction under the Death on the High Seas Act, the issue of whether the crash occurred beyond a marine league from the shores of India need not be decided. The only essential issue is whether the additional locational requirement of section 1 of the Act that the deaths occur "on the high seas" is satisfied. More precisely stated, the question is whether a crash in the territorial waters of India whether within or beyond a marine league from shore occurs "on the high seas" as that term is used in the Death on the High Seas Act.

The relevant authorities support the conclusion that territorial waters of a foreign country are "high seas" within the meaning of the Act. In *Roberts v. United States*, 498 F.2d 520 (9th Cir. 1974), the court indicated that it was hesitant to hold that foreign territorial waters are "high seas" within the meaning of the Death on the High Seas Act. *Id.* at 524. However, the court

---

**9.** In so holding, I also note that the Indian tolling statute would only apply where a court is "unable" to entertain a lawsuit due to a defect in *"jurisdiction or other cause of a like nature"* (emphasis added). There is substantial doubt whether a dismissal on *forum non con-*

*veniens* grounds would qualify under this standard.

**10.** The law of India does not recognize the law of strict product liability.

observed in a footnote that Congress may have intended the Act to encompass navigable territorial waters of foreign countries. *Id.* at 524 n.7. Every court since *Roberts* which has considered the issue has held that all navigable waters more than a marine league from the shores of the United States or its territories are "high seas" within the meaning of section 1 of the Death on the High Seas Act. *See Mancuso v. Kimex, Inc.,* 484 F.Supp. 453, 455 (S.D.Fla.1980); *First & Merchants National Bank v. Adams,* 15 Avi. 17,800 (E.D.Va.1979), *aff'd in part and rev'd in part,* 644 F.2d 878 (4th Cir. 1980); *Cormier v. Williams/Sedco/Hord Constructors,* 460 F.Supp. 1010, 1012 (E.D. La.1978); *Best v. Sikorsky Aircraft Division,* Civ. No. B–74–197 (D.Conn. May 16, 1979). I find the rationale of these cases to be persuasive. This broad interpretation of "high seas" comports with the purposes of the Death on the High Seas Act and the language of the Act itself.

Congress enacted the Death on the High Seas Act in 1920, but prior to that time the Supreme Court had concluded that general maritime law provided no basis for recovery in the case of wrongful death. *The Harrisburg,* 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886). Since several states had promulgated statutes which provided a remedy for wrongful deaths occurring in state territorial waters which at that time extended a marine league from shore, Congress acted in 1920 to furnish the remedy denied by the courts for deaths occurring beyond state jurisdiction by enacting the Death on the High Seas Act and the Jones Act. *Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Nothing in the Death on the High Seas Act or its legislative history supports the position that Congress intended to limit the scope of this remedy to deaths occurring in international waters.

The broad remedial purpose of Congress in enacting the Death on the High Seas Act is reflected in the terms of the statute itself, which applies to deaths occurring "on the high seas beyond a marine league from the shore of any State..." 46 U.S.C. § 761. The explicit exclusion of territorial waters of the United States and the use by Congress of the broadly inclusive term "high seas" in the very same sentence supports the conclusion that Congress meant "high seas" to include foreign territorial waters. In *Best v. Sikorsky Aircraft Division,* Civ. No. B–74–197 (D.Conn. May 16, 1979), the court adopted this construction of the Act and reasoned as follows:

Congress was concerned, when it passed [the Death on the High Seas Act] in 1920, to provide a wrongful death remedy for deaths occurring outside the reach of state law. Its explicit exception of deaths occurring within the territorial waters of a state was consistent with this purpose. But there is no indication that Congress intended to carve out from the statute's range of applicability any other areas of general admiralty jurisdiction, with which [the Death on the High Seas Act] is otherwise congruent. (citations omitted).

Defendants are able to point to nothing in the language of the Act or its legislative history which supports a contrary construction of "high seas," nor have the defendants called attention to authorities holding that foreign territorial waters are not "high seas" within the meaning of the Act. Instead, defendants urge this court to invoke a presumption against extraterritorial application of the Act similar to that in *United States v. Mitchell,* 553 F.2d 996 (5th Cir. 1977), where the court applied such a presumption as a principle of statutory construction in holding that Congress did not intend the Marine Mammal Protection Act, 16 U.S.C. § 1361 *et seq.,* to extend extraterritorially to the actions of an American citizen within the territorial waters of a foreign country.

I conclude that *Mitchell* is inapposite to the issue of statutory construction of the Death on the High Seas Act for several reasons. As previously noted, all courts which have considered and decided the issue have held that Congress intended the Act to apply to deaths occurring within territorial waters of foreign countries. Moreover, both *Mitchell* and *United States v. Bowman,* 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149

(1922), on which *Mitchell* relies, concern the existence of extraterritorial jurisdiction, *vel non*. Here it is conceded that jurisdiction under the Death on the High Seas Act extends extraterritorially and the only question is the extent of that jurisdiction. While there may be a requirement that Congress indicate clearly its intent to extend extraterritorially laws whose nature does not mandate such an extension, there is no requirement that geographical areas not specifically included in laws with clear extraterritorial application should be excluded. If there is any presumption at all in this latter area, it should be that once Congress has unequivocally chosen to extend its power outside the territorial boundaries of the United States, that power should be presumed to extend to its fullest extent unless specifically restricted.

Additionally, one of the bases for the decision in *Mitchell* was the court's recognition of the deference owed to the interests of a foreign sovereign in regulating natural resources within its own territorial waters.

> We cannot say that the interests of the United States in preserving dolphins outweighs the interest of the Commonwealth of the Bahamas in preserving its character as a tourist attraction by the issuance of a limited number of permits for the capture of dolphins within its narrow band of territorial waters.

553 F.2d at 1004. No similar concern circumscribes the process of statutory construction in the present case, because the interests of India may be considered in connection with the resolution of the choice of law issues.

I therefore conclude that the deaths of plaintiffs' decedents occurred "on the high seas beyond a marine league from the shore of any State...."

Defendants, relying upon *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), contend that in order to establish subject matter jurisdiction under the Act, plaintiffs must also demonstrate that this aviation tort possesses a "maritime nexus." It is clear that in *Executive Jet* the Supreme Court required a showing of a "maritime nexus" in aviation cases brought under the general maritime law. But the Court made it quite clear that such a showing was not required in aviation cases brought under the Death on the High Seas Act.

> Indeed, it may be considered settled today that this specific federal statute [Death on the High Seas Act] gives the federal admiralty courts jurisdiction of such wrongful-death actions.
>
> \* \* \* \* \* \*
>
> Of course, under the Death on the High Seas Act, a wrongful death action arising out of an airplane crash on the high seas beyond a marine league from the shore of a State may clearly be brought in a federal admiralty court.

409 U.S. at 263–64, 271, n.20, 93 S.Ct. at 502, 505. *See Roberts v. United States*, 498 F.2d at 524.

■ I conclude that this court has jurisdiction of the plaintiffs' wrongful death claims under the Death on the High Seas Act. It is unnecessary to reach the issue of whether this court has jurisdiction of plaintiffs' claims under general maritime law since identical choice of law principles would apply whether jurisdiction is grounded on the Death on the High Seas Act or general maritime law.

With regard to the choice of law issue, plaintiffs raise a threshold question, arguing in essence that no choice need now be made between American law and the law of India. Plaintiffs premise this contention upon the structure of the Death on the High Seas Act itself and the interrelationship between sections 1 and 4 of the Act.

Section 1 provides:

> Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband,

parent, child or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.

46 U.S.C. § 761.

Section 4 provides:

Whenever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect, or default occurring upon the high seas, such right may be maintained in an appropriate action in admiralty in the courts of the United States without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding.

46 U.S.C. § 764.

Plaintiffs contend that the broad language of section 1 affords claimants a cause of action under American law of general applicability and without limitation owing to citizenship of the decedent or other circumstances. Plaintiffs further contend that Congress intended section 4 as a measure to preserve any additional rights to which a plaintiff may be entitled under any foreign wrongful death statutes. Plaintiffs argue that sections 1 and 4, when read together, provide cumulative remedies for wrongful death claimants under the Act. In other words, plaintiffs maintain that the Act, rather than requiring a choice in this case between American law and Indian law, permits the maintenance of concurrent causes of action against defendants under both American law and Indian law.

In support of this proposition, plaintiffs place principal reliance upon the following three cases: *McPherson v. Steamship South African Pioneer*, 321 F.Supp. 42 (E.D.Va. 1971); *Noel v. Linea Aeropostal Venezolana*, 260 F.Supp. 1002 (S.D.N.Y.1966); and *Fernandez v. Linea Aeropostal Venezolana*, 156 F.Supp. 94 (S.D.N.Y.1957).[11]

*Fernandez* involved claims for the wrongful death of an American citizen killed on a Venezuelan plane which crashed on the high seas. The defendant airline argued that no cause of action based on American law under section 1 of the Death on the High Seas Act was available to plaintiff. Defendant further argued that only Venezuelan law, under section 4 of the Act, was applicable to claims for a death occurring on a foreign aircraft. The court rejected defendant's arguments and held that plaintiff could maintain a cause of action under section 1 of the Act. In so holding, the court employed language which on its face tends to support the contentions of plaintiffs in the instant case that sections 1 and 4 offer cumulative remedies. The court in *Fernandez* stated, for example:

But the act as passed preserved not merely rights under foreign law, but also, by § 1 of the act, gave an additional right to the personal representative of the deceased to maintain an action against the "vessel, person, or corporation which would have been liable if death had not ensued."

156 F.Supp. at 96.

*McPherson* involved the wrongful death claims of a plaintiff who alleged that she was the lawful wife of an American seaman killed in a collision between an American flag vessel and a South African flag vessel. Both the American vessel owner and the South African vessel owner were named as defendants. The court found that plaintiff was never legally married to the deceased seaman because of an existing legal impediment at the time of the marriage ceremony. The court accordingly held that plaintiff could not state a cause of action under section 1 of the Death on the High Seas Act because she did not come within the class of beneficiaries entitled to relief under the express terms of that section. Nevertheless, the court in *McPherson* held that section 4 of the Act was available to plaintiff as a remedy against the South African defendant and that the question of plaintiff's right to participate in any recovery under South African law could not therefore be summarily dismissed. The court cited *Fernandez* with approval, stating that *Fernandez*

---

11. Plaintiffs also cite another case, *Iafrate v. The Liberte*, 106 F.Supp. 619 (S.D.N.Y.1952), but this case does not expressly address the question of the propriety of cumulative remedies under the Death on the High Seas Act.

**1186**

is clear authority for the point that Sections 1 and 4 of the Death on the High Seas Act should not be limited strictly to deaths occurring on American and foreign flag vessels, respectively.

321 F.Supp. at 51.

*Noel v. Linea Aeropostal Venezolana* involved claims for wrongful death resulting from the crash of a Venezuelan aircraft on the high seas on a flight from New York City to Venezuela. Plaintiffs had already recovered a judgment for pecuniary damages under section 1 of the Act against the manufacturer of the aircraft's propellers in an earlier related action in a different federal court.[12] In *Linea Aeropostal* these same plaintiffs sought to recover, as against the Venezuelan airline, additional damages for conscious pain and suffering of the decedent and for the mental anguish of the survivors under Venezuelan law and section 4 of the Act.[13] The court sustained plaintiffs' cause of action under section 4, noting that

[It] is not authoritatively settled that §§ 1 and 4 of the Death on the High Seas Act are mutually exclusive remedies as against a single defendant, much less as against joint tortfeasors.

260 F.Supp. at 1005, n.18.

Defendants in the present litigation strongly dispute plaintiffs' construction of the interrelationship between sections 1 and 4 of the Act. Relying upon *Bergeron v. Koninklijke Luchtvaart Maatschappij, N.V.,* 188 F.Supp. 594 (S.D.N.Y.1960), *appeal dismissed,* 299 F.2d 78 (2d Cir. 1962), defendants argue that a choice must be made in this litigation between American law under section 1 and Indian law under section 4. *Bergeron* involved claims for the wrongful deaths of American citizens brought against KLM, the Dutch airline, arising out of an air crash on the high seas on a flight from Ireland to the United States. Plaintiffs asserted claims under section 1 of the Act based upon American law and claims under section 4 of the Act based upon Dutch law. The court in *Bergeron* was thus squarely faced with the question whether the Death

on the High Seas Act provides cumulative remedies under American law and foreign law.

The court in *Bergeron*, noting that the earliest cases interpreting the Act supported the position that the two sections were mutually exclusive, then went on to discuss and distinguish *Fernandez*, which impliedly held to the contrary. The court acknowledged that the interaction between the two sections was a "perplexing" question, but stated that the only satisfactory solution was to make a choice as between American law and foreign law.

[T]he presence of both Section 1 and Section 4 allows the Act to be applied with flexibility so as to arrive at the one proper choice of law to appropriately govern the litigation.

188 F.Supp. at 597. The court concluded that

[T]here is no warrant in the statutory language or policy for the maintenance of concurrent causes of action under both American law (Section 1) and foreign law (Section 4).

*Id.*

I am persuaded by the reasoning of *Bergeron* and conclude that I should choose, as between American law and Indian law, the one appropriate body of law to govern this litigation. A careful reading of the cases cited by plaintiffs demonstrates that these cases do not support the broad proposition that section 1 and section 4 provide cumulative remedies. Instead, each of the cases must be read somewhat more narrowly in the context of the particular circumstances it presents.

In *Fernandez*, for example, there is indeed language indicating that cumulative remedies are available under sections 1 and 4 of the Act. But as the court in *Bergeron* pointed out in distinguishing *Fernandez*, this broad language must be viewed in the context of the facts presented in *Fernandez.*

---

**12.** *Noel v. United Aircraft Corp.,* 219 F.Supp. 556 (D.Del.1963).

**13.** These elements of damages were not available under section 1 of the Act.

But despite this broad language, which would indicate cumulative causes of action in all situations of American deaths on foreign vessels, the court [in *Fernandez*] clearly showed its primary concern over the situation in which the applicable foreign law did not grant a cause of action for wrongful death. Thus, to guard against this possibility, a cause of action under Section 1 was found. In this regard, it is again noteworthy that the court dismissed the cause of action asserted under Venezuelan law, with leave to amend, for failure to sufficiently plead the substance of that law. Therefore, it appeared uncertain whether or not a cause of action under Venezuelan law existed.

188 F.Supp. at 596.

Moreover, the court in *Fernandez* recognized that the Death on the High Seas Act requires a choice of the applicable law to govern the issue of liability for the accident which causes death.

An act in one area may be a wrong, but in another area may not be a wrong. The Death on the High Seas Act recognizes this distinction for it does not create a cause of action or grant a right of recovery for death in every situation but only against those defendants "which would have been liable if death had not ensued." Thus the liability for an accident causing death would be dependent upon the law of the place where the accident happened—and if it happened on a foreign ship it might well be dependent upon the law which would be applicable to that ship.

156 F.Supp. at 97.

Similarly, *McPherson* presented a situation in which a plaintiff was not a beneficiary under section 1 and thus had no cause of action under that section. In this special circumstance, the court permitted plaintiff the opportunity to plead a cause of action, as against the South African defendant, based on South African law under section 4. At the same time, however, the court refused to allow plaintiff to plead a cause of action against the American defendant under section 4. In so doing, the court in *McPherson* plainly recognized the importance of applying choice of law principles in the interpretation of the Act.

We know of no authority which holds that the personal representative of an American seaman, killed aboard an American vessel as a result of a collison on the high seas with a foreign vessel, can maintain an action against his American employer under the law of the flag of the foreign vessel. Manifestly this could not have been intended by Congress in enacting either the Jones Act or the Death on the High Seas Act.

321 F.Supp. at 49, n.8.

In *Linea Aeropostal*, the court, while permitting plaintiffs to assert claims for additional damages under foreign law and section 4, emphasized that such damages were allowable because they presented no conflict with the pecuniary damages already recovered under section 1. The court thus recognized the limited scope of its holding as follows:

There is but a single cause of action for wrongful death, whether the suit be grounded under section 1 or section 4. The difference, of course, is the elements of damage, and since under Venezuelan law additional elements of damage are recognized in such an action, libelants are entitled to assert their claims with respect thereto.

260 F.Supp. at 1006.

The court likewise recognized the continuing validity of *Bergeron*:

*Bergeron*... is not to the contrary. Indeed, it holds that the remedy available to libelants, under the same circumstances as there presented, was under § 4 and not under § 1 of the Act, but that concurrent causes of action under both American law (§ 1) and foreign law (§ 4) were not maintainable.

*Id.*, n.24.

Only one case (*Bergeron*) squarely faces plaintiffs' contention that section 1 and section 4 provide cumulative remedies generally, and that case flatly rejects such a reading of the Act. Plaintiffs herein do not claim that any of the special circumstances obtaining in the cases they rely upon per-

tain to them.[14] Instead, plaintiffs urge this court to adopt a broad general rule which finds no support in the case law and which is directly contrary to the holding in *Bergeron*.

Finally, I believe the rule in *Bergeron* to be a sensible one, particularly when viewed in the context of this litigation. Here plaintiffs, nearly all citizens of India, seek to recover damages for wrongful death resulting from a crash of an Air India aircraft in Indian territorial waters. While they contend that no choice need be made between the law of India and the law of the United States, they argue in effect that they themselves should be permitted to choose, as between those two bodies of law, the one law which is most favorable to their claims. I find no warrant, whether in the Act and its legislative history or in principles of logic and fairness, for such a construction.

■ Since I conclude a choice must be made in this case between American law and Indian law, it is necessary to discover the relevant choice of law principles and then apply them to the facts and circumstances presented here. Defendants contend, and I agree, that the principles of choice enunciated by the Supreme Court in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), govern the issue of choice of law in the present case.

*Lauritzen* involved claims brought by a Danish seaman under the Jones Act, 46 U.S.C. § 688, a statute which by its terms applies to "any seaman." [15] Read literally, the Jones Act would permit a seaman of any nationality to maintain an action regardless of the locus of the accident, nationality of the shipowner, or other such factors. The Supreme Court in *Lauritzen*, however, rejected this broad view of the Jones Act's coverage, holding that such statutes apply "only to areas and transactions in which American law would be con-

sidered operative under prevalent doctrines of international law." 345 U.S. at 577, 73 S.Ct. at 925. This international law, the Court stated,

aims at stability and order through usages which considerations of comity, reciprocity and long-range interest have developed to define the domain which each nation will claim as its own.

*Id.* at 582, 73 S.Ct. at 928. The Court held that the applicability of maritime law in a given case would be determined by "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved." *Id.*

In *Romero v. International Terminal Operating Company*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the Supreme Court reaffirmed the validity of the *Lauritzen* test and held that it was equally applicable to choice of law questions arising in claims brought under the general maritime law. *Id.* at 381–84, 79 S.Ct. at 485–86. The question of the applicability of *Lauritzen* to claims brought under the Death on the High Seas Act, on the other hand, has never been authoritatively settled. Many courts which have considered the question, however, have stated without much discussion that the choice of law principles of *Lauritzen* are equally applicable to claims brought under the Death on the High Seas Act. *See DeMateos v. Texaco, Inc.*, 562 F.2d 895, 900 (3d Cir. 1977); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 454 (2d Cir. 1975); *Symonette Shipyards, Ltd. v. Clark*, 365 F.2d 464, 467 (5th Cir. 1966); *Noel v. United Aircraft Corp.*, 202 F.Supp. 556, 557–58 (D.Del.1962); *Bergeron*, 188 F.Supp. at 596.

I am persuaded that the *Lauritzen* test should be applied to choice of law problems in cases brought under the Death on the High Seas Act. Congress promulgated the Death on the High Seas Act in 1920 to

---

14. For instance, unlike the situation presented in *Fernandez*, there is apparently no question here as to the availability of a remedy under foreign law. Defendants assert, and plaintiffs do not dispute, that the Indian Fatal Accident Act of 1855 provides a remedy for wrongful death.

15. Section 688 provides in pertinent part:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury...

provide a remedy for wrongful deaths on the high seas and to fill a gap in the general maritime law. Because of this close connection between the Act and general maritime law, the rationale of the Supreme Court in *Romero* applies with equal force to cases brought under the Act.

> The broad principles of choice of law and the applicable criteria of selection set forth in *Lauritzen* were intended to guide courts in the application of maritime law generally. Of course, due regard must be had for the differing interests advanced by varied aspects of maritime law. But the similarity in purpose and function of the Jones Act and the general maritime principles of compensation for personal injury, admit of no rational differentiation of treatment for choice of law purposes. Thus the reasoning of *Lauritzen v. Larsen* governs all claims here.

358 U.S. at 382, 79 S.Ct. at 485.

Before applying the *Lauritzen* test to the facts in this case, it is necessary to address plaintiffs' arguments questioning the continuing validity of the *Lauritzen* approach. Plaintiffs contend that the *Lauritzen* approach to choice of law problems is "restricted" and "outdated." Plaintiffs therefore urge this court to adopt a "governmental interest analysis" approach, applying the law of the jurisdiction which has the greatest interest in applying its law to the specific issue creating the choice of law problem.[16]

Plaintiffs cite no authority for displacing *Lauritzen*. Indeed, in *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82 (9th Cir. 1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (U.S.1981), the Ninth Circuit recently rejected a similar plea for modification of *Lauritzen*. In *Phillips*, plaintiffs urged the court to apply the law of the United States (in that case the law of the flag) on the basis of an asserted strong interest of the United States in assuring compliance with the safety requirements included in American laws governing registration of vessels. The court stated that

these arguments went "beyond the scope of the factors outlined in *Lauritzen* and *Rhoditis*." 632 F.2d at 88. Accordingly, the Ninth Circuit concluded that "this asserted regulatory interest should not be given significant weight beyond the consideration already given the law of the flag in balancing the relevant contacts." *Id.* I see no reason to depart from this sound course in applying *Lauritzen* in the present case.

In *Lauritzen*, the Supreme Court enumerated seven points of contact to be considered in choosing the applicable law: 1) the place of the wrongful act; 2) the law of the flag; 3) the allegiance or domicile of the injured; 4) the allegiance of the shipowner; 5) the place of contract; 6) the inaccessibility of a foreign forum; and 7) the law of the forum. In *Hellenic Lines, Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court added an eighth factor: the shipowner's base of operations. *Id.* at 309, 90 S.Ct. at 1734. When these factors are applied to the facts in this litigation the essentially foreign nature of this aircraft accident clearly emerges.

1. *The place of the wrongful act:*

The accident from which plaintiffs' claims arise occurred in the Arabian Sea within the twelve mile limit claimed by India as its territorial waters. Thus the accident site is within the sovereign control of the government of India.

2. *The law of the flag:*

The law of the flag, the law under which a vessel or aircraft operates, is in this case the law of India. Air India, the owner of the ill-fated aircraft, is India's flag carrier and is wholly owned and controlled by the government of India.

3. *The allegiance or domicile of the injured:*

All but two of the 190 persons killed in the accident were citizens and domiciliaries

---

**16.** Applying this approach to the facts of this litigation, plaintiffs assert that American strict products liability law should govern because the United States has a predominant interest in promoting the manufacture of safe products within its borders.

of India; all but three of the approximately 327 plaintiffs are citizens and domiciliaries of India.[17]

4. *The allegiance of the shipowner*:

As previously discussed, Air India, the owner of the aircraft, is wholly owned and controlled by the government of India.

5. *The place of the contract*:

As employed by the Supreme Court in *Lauritzen*, this factor denoted the place where the articles of shipping were signed. Although this factor has no literal application to air passenger transportation, an analogy can be made to the place where the passengers purchased their airline tickets. Defendants maintain, and plaintiffs do not dispute, that all decedent passengers purchased their tickets in India. In this context, it is also noteworthy that the flight originated in India, was bound for Dubai and had no geographical nexus to the United States.

6. *The inaccessibility of a foreign forum*:

As explained above, it is my belief that the courts of India would in all likelihood not entertain plaintiffs' claims at the present time. This fact does not require application of American law to plaintiffs' claims, however, because section 4 of the Act enables federal district courts to adjudicate wrongful death claims under foreign law where appropriate under the relevant choice of law principles.

7. *The law of the forum*:

The forum is the United States, but this factor does not favor application of American law in the circumstances presented here. In denying forum non conveniens dismissal of these cases, I stated that these cases should be tried in India, and I declined to dismiss only because of doubts about the availability of a forum in India. If these cases were in fact tried in India, I have

little doubt that the courts of India would apply Indian law to resolve plaintiffs' claims. The Supreme Court in *Lauritzen*, in language particularly appropriate to the situation presented here, recognized the minimal importance of the forum factor in choosing the applicable law:

> The purpose of a conflict-of-laws doctrine is to assure that a case will be treated in the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum.

345 U.S. at 591, 73 S.Ct. at 932.

8. *Shipowner's base of operations*:

Air India is based in Bombay, India, and the flight in question originated in Bombay.

Six of the eight enumerated points of contact clearly point towards application of Indian law while no factor favors application of the law of the United States. Nevertheless, plaintiffs suggest that a different balance can be struck by the simple expedient of rewriting the *Lauritzen* and *Rhoditis* factors to reflect the fact that this is a products liability case against the manufacturers of the aircraft and its instruments. Plaintiffs suggest, for instance, substitution of "shipbuilder" for "shipowner" wherever the latter appears in the *Lauritzen* test.

Plaintiffs can cite no authority for such a wholesale revision of the *Lauritzen* analysis. Furthermore, it is well to remember that *Lauritzen* directed courts to ascertain and value points of contact between the "transaction" and the countries involved. Clearly the "transaction" at issue here, for purposes of applying *Lauritzen*, is the aircraft accident itself. The allegedly defective design of the aircraft, when viewed in this perspective, therefore represents merely one facet of a multi-faceted transaction. At most, the manufacture of this aircraft in the United States by an American corporation simply constitutes an additional point of contact in the *Lauritzen* equation.[18]

---

**17.** Two deceased passengers were alleged to be United States citizens, and the three plaintiffs bringing claims for the wrongful deaths of those two passengers are also alleged to be United States citizens.

**18.** In *Rhoditis*, the Supreme Court, while adding an eighth factor to the *Lauritzen* test, stated that "there well may be others." 398 U.S. at 309, 90 S.Ct. at 1734.

In any event, plaintiffs' arguments cannot obscure the essentially Indian character of this aircraft accident in Indian territorial waters on a flight originating in India involving an Indian air carrier and predominantly Indian victims. India's paramount interest in this accident is evident. By any reasonable means of weighing and valuing the relevant points of contact,[19] the *Lauritzen* analysis dictates the choice of Indian law in this case.

Defendants' motion to dismiss for *forum non conveniens* is DENIED. Plaintiffs' claims for wrongful death may proceed only under section 4 of the Death on the High Seas Act and must be governed by the law of India.

19. The Ninth Circuit has noted that courts in applying the *Lauritzen* test, must compare and balance the substantiality of American contacts against the substantiality of foreign contacts. *See Phillips*, 632 F.2d at 86.